EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Edgardo Cruz Vélez, como aspirante a la Alcaldía del Municipio de Guánica bajo la modalidad de nominación directa<br><br>    Peticionario<br><br>            v.<br><br>Comisión Estatal de Elecciones representada por su Presidente, Francisco Rosado Colomer<br><br>    Peticionaria<br><br>Roberto Iván Aponte Berríos, como Comisionado Electoral del Partido Independentista Puertorriqueño y Otros<br><br>    Recurridos<br>_____<br>Ismael "Titi" Rodríguez Ramos, como aspirante a la Alcaldía de Guánica por el Partido Popular Democrático<br><br>    Recurrido<br><br>            v.<br><br>Comisión Estatal de Elecciones, representada por su Presidente, Francisco Rosado Colomer y Edgardo Cruz Vélez, como aspirante a la Alcaldía del Municipio de Guánica bajo la modalidad de nominación directa<br><br>    Peticionarios<br><br>Roberto Iván Aponte Berríos, como Comisionado Electoral del Partido Independentista Puertorriqueño y Otros<br><br>    Recurridos | Certiorari<br><br>2021 TSPR 34<br><br>206 DPR ____ |

Número del Caso:  CC-2021-169
                Cons. con
                CC-201-171


Fecha: 16 de marzo de 2021

Tribunal de Apelaciones:

    Panel II

**CC-2021-169**

Abogada de la parte peticionaria:

    Lcda. Vickmarie Sepúlveda Santiago

**CC-2021-171**

Abogado de la parte peticionaria:

    Lcdo. Juan Antonio Corretjer Russi

Materia:  Sentencia con Opinión de Conformidad y Opinión Disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Edgardo Cruz Vélez, como aspirante a la Alcaldía del Municipio de Guánica bajo la modalidad de nominación directa

    Peticionario

        v.

Comisión Estatal de Elecciones representada por su Presidente, Francisco Rosado Colomer

    Peticionaria

Roberto Iván Aponte Berríos, como Comisionado Electoral del Partido Independentista Puertorriqueño y Otros

    Recurridos

_____

Ismael "Titi" Rodríguez Ramos, como aspirante a la Alcaldía de Guánica por el Partido Popular Democrático

    Recurrido

        v.

Comisión Estatal de Elecciones, representada por su Presidente, Francisco Rosado Colomer y Edgardo Cruz Vélez, como aspirante a la Alcaldía del Municipio de Guánica bajo la modalidad de nominación directa

    Peticionarios

Roberto Iván Aponte Berríos, como Comisionado Electoral del Partido Independentista Puertorriqueño y Otros

    Recurridos

CC-2021-169 cons con. CC-2021-171

SENTENCIA

En San Juan, Puerto Rico a 16 de marzo de 2021.

Por estar igualmente dividido el Tribunal, conforme a lo dispuesto en la Regla 4(a) del Reglamento del Tribunal Supremo de Puerto Rico, 4 LPRA Ap. XXI-B, R. 4(a), se expiden los autos en los casos de referencia, se consolidan, y se dicta Sentencia confirmando el dictamen emitido por el Tribunal de Apelaciones.

Lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo.

El Juez Asociado señor Colón Pérez emitió una Opinión de Conformidad a la que se unen la Jueza Presidenta Oronoz Rodríguez y los Jueces Asociados señores Martínez Torres y Feliberti Cintrón. El Juez Asociado señor Estrella Martínez emitió una Opinión Disidente a la cual se unen la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Kolthoff Caraballo.

El Juez Asociado señor Rivera García disiente y desea hacer constar la siguiente expresión:

"El Juez Asociado señor Rivera García hubiera expedido el recurso y hubiese resuelto que procedía la celebración de una Vista en los méritos ante el Tribunal de Primera Instancia."

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Edgardo Cruz Vélez, como aspirante a la Alcaldía del Municipio de Guánica bajo la modalidad de nominación directa<br><br>    Peticionario<br><br>        v.<br><br>Comisión Estatal de Elecciones representada por su Presidente, Francisco Rosado Colomer<br><br>    Peticionaria<br><br>Roberto Iván Aponte Berríos, como Comisionado Electoral del Partido Independentista Puertorriqueño y Otros<br><br>    Recurridos<br><br>_____<br><br>Ismael "Titi" Rodríguez Ramos, como aspirante a la Alcaldía de Guánica por el Partido Popular Democrático<br><br>    Recurrido<br><br>        v.<br><br>Comisión Estatal de Elecciones, representada por su Presidente, Francisco Rosado Colomer y Edgardo Cruz Vélez, como aspirante a la Alcaldía del Municipio de Guánica bajo la modalidad de nominación directa<br><br>    Peticionarios<br><br>Roberto Iván Aponte Berríos, como Comisionado Electoral del Partido Independentista Puertorriqueño y Otros<br><br>    Recurridos | CC-2021-169 cons con. CC-2021-171 |

Opinión de Conformidad emitida por el Juez Asociado señor COLÓN PÉREZ a la que se unen la Jueza Presidenta ORONOZ RODRÍGUEZ, el Juez Asociado señor MARTÍNEZ TORRES y el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico a 16 de marzo de 2021.

Estamos conformes con el resultado al que hoy se llega. Ello, por entender que en el presente caso –– como correctamente decidieron tanto el Tribunal de Apelaciones como el Tribunal de Primera Instancia ––, al realizarse el escrutinio final de papeletas por nominación directa a la Alcaldía del Municipio de Guánica, se duplicaron ciertos votos a favor del señor Edgardo Cruz Vélez (en adelante, "señor Cruz Vélez"). Veamos.

I.

Como muchos y muchas recordarán, y en lo atinente a la controversia que nos ocupa, el pasado 3 de noviembre de 2020 se celebraron en nuestro País las Elecciones Generales. Como consecuencia de ello, la noche del evento electoral, la Comisión Estatal de Elecciones (en adelante, "C.E.E.") –– mediante un primer anuncio –– reportó, de manera parcial, ciertos resultados correspondientes a la candidatura por la alcaldía del Municipio de Guánica, a saber: el candidato del Partido Popular Democrático (PPD), Ismael Rodríguez Ramos, obtuvo 1,962 votos; el candidato del Partido Nuevo Progresista (PNP), Santos Oscar Seda Nazario, obtuvo 1,953 votos; y la candidata del Partido Independentista

Puertorriqueño (PIP), María J. Ruíz Ramos, obtuvo 86 votos. También se informó que existían **2,041 votos** por nominación directa.

Días más tardes, entiéndase el 7 de noviembre de 2020, la C.E.E. certificó los resultados preliminares para la referida contienda a la Alcaldía del Municipio de Guánica. De dicha certificación se desprende que, a esa fecha, se habían contabilizado el cien por ciento (100%) de los colegios escrutados por las máquinas de escrutinio electrónico y, en cuanto a la alcaldía del Municipio de Guánica, sólo se informaron los resultados que obtuvieron los candidatos afiliados a alguno de los partidos políticos, conforme lo define el Código Electoral de 2020, *infra*. Es decir, no se reportaron los números correspondiente a los votos de nominación directa que se habían anunciado previamente en la noche del evento.

Y es que los votos por nominación directa (*write-in*), -- los cuales no podían ser contabilizados por las máquinas electrónicas destinadas al conteo de votos el día de las elecciones generales --, pasaban por un proceso de contabilización y adjudicación distinto. Ese procedimiento, según fue diseñado en cierto manual de la C.E.E., instituyó lo que se conoce como la Unidad 75 y la Unidad 79.

De esta forma, los mencionados votos de nominación directa se remitieron a una *primera mesa especial* que se identificó como la **Unidad 75 del Precinto 048 de Guánica,**

en donde serían contabilizados y adjudicados. Luego, y solo aquellos votos que no obtuvieran unanimidad en la mesa identificada como Unidad 75, pasarían entonces a una *segunda mesa especial* identificada como **Unidad 79 del Precinto 048 de Guánica**, la cual era atendida por los Comisionados Alternos.

Ante ese panorama, y para dirigir el referido proceso de contabilización y adjudicación de votos, el Hon. Francisco J. Rosado Colomer (en adelante, "Presidente de la C.E.E.") emitió dos (2) *Resoluciones*. Ambas tenían el propósito de establecer cuáles votos por nominación directa serían considerados válidos y cuáles no. En otras palabras, estas *Resoluciones* pautaban las reglas para que las personas en las mesas especiales determinaran cuáles votos o papeletas con nominación directa se contabilizarían y cuáles se descartarían.

Así, la *Resolución CEE-AC-20-546*, emitida el 14 de diciembre de 2020, establecía que se aceptarían sesenta y cuatro (64) formas del nombre del señor Edgardo Cruz Vélez (en adelante, "señor Cruz Vélez"), candidato a la Alcaldía de Guánica mediante la modalidad de nominación directa (*"write in"*). Mientras, la *Resolución CEE-AC-20-547*, emitida el 15 de diciembre de 2020, prohibía que se contaran votos que no incluyeran una marca en el encasillado correspondiente a la columna de nominación directa.

Amparado en dichas *Resoluciones*, y en el diseño de las mesas especiales para contabilizar, adjudicar y sumar los votos por nominación directa en el Precinto 048 de Guánica, se realizó el correspondiente escrutinio entre los días 11 al 20 de diciembre de 2020.

Completados los trabajos, el **21 de diciembre de 2020** la C.E.E. emitió un *Informe Preliminar de consolidación de nominación directa de alcalde de Guánica* (en adelante, "*Informe Preliminar*"). En dicho *Informe Preliminar*, se certificó que el señor Cruz Vélez había obtenido la cantidad de **2,335 votos** por nominación directa. Véase, Anejo 1.[1]

Ahora bien, debemos señalar que las *Resoluciones* antes citadas (entiéndase, *CEE-AC-20-546* y *CEE-AC-20-547*), y que dieron paso al *Informe Preliminar* mencionado en el párrafo anterior, fueron impugnadas judicialmente. De ahí que, el caso de epígrafe sea una secuela del caso *Rodríguez Ramos v. Comisión Estatal de Elecciones,* 2021 TSPR 03, 205 DPR ___ (2021).

En aquella ocasión, esta Curia emitió una *Opinión* mediante la cual se confirmó determinada *Sentencia* dictada por el Tribunal de Primera Instancia en el caso civil núm.

---

[1] Nótese que las primeras catorce (14) líneas de la tabla trazada en el *Informe Preliminar*, responden a los votos de nominación directa que pasaron a la **Unidad 75**, -- lo que fue la primera mesa especial -- , y el resto a las Unidades 74, 77, 79 y 80. **Se lee además que, para la Unidad 79 se adjudicaron y sumaron un total de cincuenta y cinco (55) votos. Este *Informe Preliminar*, como se indica al final del documento, está acompañado de ciertos anejos, que a su vez son cientos de páginas de actas de incidencias y hoja de trámite que apoyan la sumatoria allí reportada.** Véase, *Apéndice del certiorari* del señor Cruz Vélez, págs. TS-396-TS-578. Véase, también; *Apéndice del certiorari* de la C.E.E, págs. 383-565.

SJ2020CV07062. *Íd*. En atención a ello, mandatamos dos (2) tareas a la C.E.E.: 1) que adjudicara las papeletas por nominación directa a favor del señor Cruz Vélez, aun cuando no tuvieran su nombre completo o no estuviera escrito correctamente; y 2) que validara las papeletas sin marca en el encasillado de nominación directa de las que se pudiera desprender la intención del elector de votar a favor del señor Cruz Vélez.

Fue entonces que, de conformidad con lo ordenado, el 14 de enero de 2021 la C.E.E. comenzó el proceso de contabilizar las papeletas que no se habían adjudicado previamente a favor del señor Cruz Vélez, porque fueron descartadas a la luz de lo pautado en las referidas *Resoluciones*. Ese proceso duró alrededor de un día.

Al día siguiente, es decir, el **15 de enero de 2021**, la C.E.E. emitió cierta *Certificación* en la cual expresó que, finalizado el correspondiente escrutinio y tras haberse contabilizado y adjudicado el cien por ciento (100%) de los votos, certificaba unos **2,411 votos** por nominación directa a favor del señor Cruz Vélez. Sin embargo, advirtió que dicho documento no conllevaba una certificación formal de ningún candidato, mas sólo informaba los resultados. Véase, Anejo 2.[2]

En igual fecha, y ante lo expuesto en la precitada *Certificación*, el señor Cruz Vélez instó un *Recurso de*

---

[2] Se incluye *Certificación* emitida el 15 de enero de 2021. Véase, además, *Apéndice del certiorari* del señor Cruz Vélez, págs. TS-581; *Apéndice del certiorari* de la C.E.E, págs. 270 y 568.

*revisión judicial* en el Tribunal de Primera Instancia (SJ2021CV00287) bajo el Art. 13.2 del Código Electoral de Puerto Rico de 2020, *infra*, (en adelante, "Código Electoral de 2020"). En apretado resumen, solicitó que se le ordenara a la C.E.E. dejar sin efecto la *Certificación* que había emitido el 31 de diciembre de 2020, mediante la cual se declaró al Hon. Ismael Rodríguez Ramos como Alcalde Electo de Guánica[3] y que, a su vez, emitiera una nueva certificación declarando al señor Cruz Vélez como nuevo alcalde electo por el referido Municipio. En otras palabras, mediante el mencionado recurso de revisión el señor Cruz Vélez también solicitó la impugnación de la elección al amparo del Art. 10.15 del Código Electoral de 2020, *infra*.[4]

Es menester pausar aquí para subrayar que, entre tanto, el **21 de enero de 2021** la C.E.E. emitió una *Certificación de desacuerdo-Resolución,* CEE-AC-21-011. En síntesis, allí se recogió cierta discusión habida entre los Comisionados Electorales luego de que, el 14 de enero de 2021, un representante del señor Cruz Vélez presentara determinadas actas de incidencias correspondientes a la Unidad 75 del Precinto 048 de Guánica y alegara que las mismas no habían sido adjudicadas en el *Informe Preliminar*

---

[3] Valga señalar que, apoyado en esta *Certificación*, el 11 de enero de 2021 el Hon. Ismael Rodríguez Ramos juramentó como Alcalde del Municipio de Guánica.

[4] Al respecto, la C.E.E. presentó cierto escrito mediante el cual expresó que se allanaba al remedio solicitado por el señor Cruz Vélez.

emitido el 21 de diciembre de 2020. A su entender, las mismas incidían en la cantidad de votos adjudicados a favor del señor Cruz Vélez. Véase, Anejo 3.[5]

**Ante la denuncia, y por no haber consenso entre los comisionados, el Presidente de la C.E.E. instruyó a que se añadieran treinta y ocho (38) votos a favor del señor Cruz Vélez, lo que dio paso a la *Certificación* que se emitió el 15 de enero de 2021, y a la cual hemos hecho referencia.**[6] Dicha determinación fue oportunamente notificada a todas las partes concernientes.

---

[5] Se incluye *Certificación de desacuerdo-Resolución,* CEE-AC-21-011, emitida el 21 de enero de 2021. Vale mencionar que dicha *Certificación* está acompañada, en el original y en el expediente, de las actas disputadas. Véase, *Apéndice del certiorari* del señor Cruz Vélez, págs. TS-106-TS-210; *Apéndice del certiorari* de la C.E.E, págs. 271-633 (Nota: la numeración de las páginas de los anejos de éste recurso contienen un error; ver final de Pieza 2 e inicio de Pieza 3).

[6] El Presidente de la C.E.E. fundamento su determinación como sigue:

> Haciéndome eco de mi introducción, yo tengo que expresar además, que en este asunto particular, **más allá de que podemos observar las actas donde se tabularon y adjudicaron los votos de forma manual, estas no se encontraban en el maletín que produjo el informe preliminar**, que, como bien dice el quinto partido, fue la base para preparar todos los sobres [que] aparecieron en el maletín de donde emanan o se producen las actas que finalmente se colocaron en el maletín de apoyo del informe. **Si nos crea gran suspicacia que todos sean del mismo día, todos son del 18 de diciembre de 202[0]** [sic.]. No he recibido si se me ha presentado una razón, causa o justificación para que esto haya ocurrido, que me permita concluir que estos, estas papeletas se adjudicaron en otra unidad. Yo hubiese entendido que una estuviera fuera de lugar, a lo sumo dos (2) pero aquí tenemos casi diez (10) y eso sí me crea suspicacias. **No sé qué fue lo que ocurrió, no sé si fue un error humano, pero estando dentro del maletín, las papeletas no hay una explicación para que las actas no estén dentro del maletín correspondiente a las actas que producirían el resumen que se llama informe**. (Énfasis nuestro). Véase, *Apéndice del certiorari* del señor Cruz Vélez, págs. TS-107. Véase, también; *Apéndice del certiorari* de la C.E.E, págs. 272.

Así pues, y luego de varios trámites procesales no necesarios aquí pormenorizar, el 25 de enero de 2021 -- en un primer escrito -- el Hon. Ismael Rodríguez Ramos se opuso al recurso de revisión presentado por el señor Cruz Vélez. En apretada síntesis, adujo que existía una duplicidad de treinta y ocho (38) votos a favor del señor Cruz Vélez y que la C.E.E. se extralimitó en sus facultades, toda vez que actuó de forma *ultra vires* al no cumplir con el mandato que emitió este Tribunal el pasado mes de enero. Esto, porque entendía que no procedía contabilizar nuevamente los votos que contenían una de las sesenta y cuatro (64) variaciones del nombre Edgardo Cruz Vélez -- pues ya se había hecho en una etapa anterior del escrutinio --, sino que se debían escrutar aquellas papeletas (votos) que tenían otra variación del nombre, distinto a las sesenta y cuatro (64) formas previamente adjudicadas, así como las que no contenían una marca en el encasillado de nominación directa.

Por su parte, en igual fecha, -- en un segundo escrito -- el Hon. Ismael Rodríguez Ramos también presentó ante el Tribunal de Primera Instancia un *Recurso de Revisión Judicial* (SJ2021CV00438) en el que impugnó las *Certificaciones* emitidas por la C.E.E. los días 15 y 21 de enero de 2021, amparado en el Art. 13.2 del Código Electoral de 2020, *infra*. Por igual, fundamentó lo anterior en que los únicos votos que se debían contabilizar en el proceso celebrado el 14 de enero de

2021 eran los votos que no contenían una marca en el encasillado.

Dicho de otro modo, a juicio del Hon. Ismael Rodríguez Ramos, para el mes de diciembre de 2020 la C.E.E. ya había contado, adjudicado y sumado todos los votos de nominación directa, excepto aquellos que tuvieron un espacio en blanco en el encasillado de nominación directa junto a un nombre escrito o los que tuvieran otra variación del nombre. Esgrimió que, conforme a ello, solo restaba sumar veintiún (21) votos. El mencionado petitorio fue notificado a todas las partes mediante correo electrónico, el cual incluyó copia del recurso y sus anejos. Pasados varios días, y a solicitud del Hon. Ismael Rodríguez Ramos, el foro primario consolidó el caso SJ2021CV00438 con el SJ2021CV00287.

En la misma fecha, el 25 de enero de 2021 para ser exactos, y con un tono parecido a sus anteriores comparecencias, -- en un tercer escrito -- el Hon. Ismael Rodríguez Ramos también sometió una *Moción urgente en solicitud de remedio por incumplimiento de la CEE con Sentencia según confirmada por el Tribunal Supremo*.[7] Como claramente surge del título de su escrito, éste reclamó que la C.E.E. no aseguró el cumplimiento de lo ordenado en

---

[7] Como ya mencionamos, la controversia que dio paso a ese caso versaba sobre la impugnación de la *Resolución CEE-AC-20-546* (emitida el 14 de diciembre de 2020), que establecía que se aceptarían sesenta y cuatro (64) formas del nombre del señor Cruz Vélez, y la *Resolución CEE-AC-20-547*, (emitida el 15 de diciembre de 2020) que prohibía que se contaran votos que no incluyeran una marca en el encasillado correspondiente a la columna de nominación directa.

dicha *Sentencia*. Tal solicitud fue declarada no ha lugar por el foro primario, quien expresó que la *Certificación* emitida por la C.E.E. el 15 de enero de 2021 cumplió con la *Sentencia* emitida por ese foro.[8] El Hon. Ismael Rodríguez Ramos solicitó la reconsideración de dicha determinación, pero también fue denegada.

Así las cosas, el 1 de febrero de 2021 el Hon. Ismael Rodríguez Ramos sometió una detallada *Moción de sentencia sumaria*, a la cual anejó declaraciones juradas y una multiplicidad de documentos expedidos por la C.E.E. En esencia, en el referido escrito, éste alegó que debía desestimarse el recurso presentado por el señor Cruz Vélez, por razón de que las *Certificaciones* emitidas el 15 y el 21 de enero de 2021 adjudicaron treinta y ocho (38) votos a favor de éste de forma incorrecta. Consideró que no procedía atribuirle deferencia alguna a lo expresado por la C.E.E. en las referidas *Certificaciones*, pues insistió en que ellas reflejaban votos duplicados. Véase, Anejo 4 (Ilustración que incluyó el Hon. Ismael Rodríguez Ramos en su Moción de Sentencia Sumaria).[9]

Enterado de lo anterior, el señor Cruz Vélez presentó su oposición a la solicitud de sentencia sumaria, anejando junto a ello varias copias de mociones previamente presentadas al tribunal y de varios documentos emitidos por la C.E.E. Destacó que el 26 de enero de 2021, el foro

---

[8] Véase, *Apéndice del certiorari* del señor Cruz Vélez, pág. TS-782. Véase, también; *Apéndice del certiorari* de la C.E.E, pág. 769.

[9] Véase, *Apéndice del certiorari* de señor Cruz Vélez, pág. TS-315.

primario, -- por voz del Hon. Anthony Cuevas Ramos --, en la etapa post-sentencia del caso SJ2020CV07062 -- ya había adjudicado la controversia sobre los presuntos treinta y ocho (38) votos duplicados, por lo que invocó la doctrina de cosa juzgada en su modalidad de impedimento colateral por sentencia. De la mano, solicitó la desestimación de la causa de acción por entender que no se había adquirido jurisdicción sobre la materia.

Además, el señor Cruz Vélez alegó que no procedía resolver el caso por la vía sumaria porque, a su entender, la parte peticionaría no había anejado toda la documentación necesaria, y porque el cálculo matemático que sugería el Hon. Ismael Rodríguez Ramos inducía a error. Por lo que, en todo caso, se debía celebrar una vista evidenciaria.

Del mismo modo, pero en escrito separado, la C.E.E. se opuso a la moción de sentencia sumaria presentada por el Hon. Ismael Rodríguez Ramos y solicitó la desestimación parcial del recurso. En su oposición, el referido organismo electoral planteó que procedía la desestimación del caso, según quedó consolidado, por entender que las partes no fueron debidamente emplazadas conforme a la Regla 4.4 de Procedimiento Civil, *infra*. Asimismo, adujo que no existía jurisdicción sobre la materia por las mismas razones que expresó el señor Cruz Vélez en su oposición. Argumentó, además, que el proceso celebrado el 14 de enero de 2021 fue uno de contabilización y

adjudicación de todos los votos de nominación directa, salvo los votos añadidos la madrugada del 15 de enero de 20201, tal y como se recoge en la *Certificación* del 21 de enero de 2021; esto último, porque de forma sorpresiva aparecieron unas actas que presuntamente no se sumaron en el *Informe Preliminar* emitido el 21 de diciembre de 2020. Explicó que la razón principal para la decisión de sumar los treinta y ocho (38) votos que surgían de las actas disputadas, fue porque dichas actas no se encontraban en el maletín que produjo el precitado *Informe Preliminar*.

Evaluados los argumentos esgrimidos por las partes, el 17 de febrero de 2021 el Tribunal de Primera Instancia, luego de determinar que tenía jurisdicción sobre la materia y sobre las personas con interés en el presente litigio, por voz de la Hon. Rebecca de León Ríos, dictó una *Sentencia Sumaria*. Al así hacerlo, consignó cuarenta y siete (47) determinaciones de hechos, de las cuales -- **por ser altamente ilustrativas de lo sucedido en el conteo de papeletas relacionadas a la contienda por la Alcaldía del Municipio de Guánica** -- destacamos las siguientes:[10]

. . .

8. Los votos de nominación directa emitidos en la papeleta municipal del Precinto 048 (al igual que para el resto de los precintos), no son leídas por la máquina de escrutinio electrónico. Por consiguiente, las mismas son referidas en el proceso del escrutinio general a la Unidad 75 del Precinto 048 de Guánica. Anejo 3 en la pág. 36.

---

[10] Véase, *Apéndice del certiorari* del señor Cruz Vélez, págs. TS-1224-1235.

9. En la **Unidad 75** del Precinto 048 se procede a adjudicar las papeletas no leídas o adjudicadas por la máquina de escrutinio electrónico, conforme a las normas de adjudicación de votos de la CEE. Anejo 3 en la pág. 36.

10. En los casos en que no haya unanimidad en la adjudicación de los votos en la Unidad 75 del Precinto 048 (u otro), se realiza un referido de aquellas papeletas para ser consideradas en la **Unidad 79** de los Comisionados Electorales Alternos ("CA"). Los CA proceden a considerar las papeletas referidas, adjudicarlas y contabilizarlas. Anejo 3 en la pág. 37.

11. **Luego que los CA consideran las papeletas referidas desde la Unidad 75, las adjudican y las contabilizan, los votos que corresponden a dicho ejercicio son computados bajo la Unidad 79 en los resultados informados por la CEE**. Anejo 5.

12. En el Precinto 048 de Guánica, **desde la Unidad 75, fueron referidas papeletas en controversia hacia la Unidad 79** de los CA, y los distintos referidos, por Unidad y Colegio específicos, tuvieron la **consecuencia de ser convertidos en los Colegios que siguen** dentro de la Unidad 79 (Anejo 6, en la pág. 7):

| Unidad Original | Colegio Original | Unidad 79 (conversión) | Colegio de la Unidad 79 |
|---|---|---|---|
| 06 | 02 | 79 | 02 |
| 06 | 03 | 79 | 03 |
| **07** | **01** | **79** | **07** |
| 07 | 02 | 79 | 04 |
|  |  |  |  |
| 08 | 01 | 79 | 05 (primer sobre) |
| 08 | 01 | 79 | 06 (Segundo sobre) |
| **09** | **01** | **79** | **08** |
| **09** | **02** | **79** | **09** |
| **09** | **03** | **79** | **10** |
| **10** | **01** | **79** | **11** |
| **10** | **02** | **79** | **12** |
| **13** | **01** | **79** | **13** |
| **13** | **02** | **79** | **14 (primer sobre)** |
| 13 | 02 | 79 | 15 (segundo sobre) |

13. De los referidos recibidos en la Unidad 79 en Guánica, dentro del escrutinio general, **se adjudicaron y contabilizaron a favor del Sr. Edgardo Cruz Vélez 55 votos. Estos 55 votos se distribuyen en los colegios del 2 al 15 de la Unidad 79, según surge del hecho incontrovertido anterior.** Anejo 6, en la pág. 3; Anejo 7 (Certificación de la CEE del 26 de enero de 2021)

. . .

16. En la **Unidad 79, Colegio 7,** se adjudicaron **2 votos** a favor de Cruz Vélez. Esos votos, fueron el resultado del referido de papeletas que se realizó hacia la Unidad 79, correspondientes a votos emitidos el día de la elección general en la **Unidad 7 Colegio 1** del Precinto 048 de Guánica. Anejo 10, en la págs. 3, 4 y 8 (acta acompañada por el Presidente de la CEE a su Certificación del 21 de enero de 2021); Anejo 11, en las págs. 2, 3 y 6 (Acta entregada por la CEE el 27 de enero de 2021); Anejo 7, Certificación de la CEE; Anejo 36, ¶¶ 2-6, en las págs. 1-2 (Declaración Jurada Sr. José Rosario).

. . .

20. En la **Unidad 79, Colegio 8,** se adjudicaron **5 votos** a favor de Cruz Vélez. Esos votos, fueron el resultado del referido de papeletas que se realizó hacia la Unidad 79, correspondientes a votos emitidos el día de la elección general en la **Unidad 9 Colegio 1** del Precinto 048 de Guánica. Anejo 15, en la págs. 2, 3, 4 y 8 (acta acompañada por el Presidente de la CEE a su Certificación del 21 de enero de 2021); Anejo 16, en las págs. 2, 3, 4 y 8 (Acta entregada por la CEE el 27 de enero de 2021); Anejo 7, Certificación de la CEE; Anejo 37, ¶¶ 2-6, en las págs. 1-2 (Declaración Jurada Sr. Julio Méndez González).

21. En la **Unidad 79, Colegio 9,** se adjudicaron **9 votos** a favor de Cruz Vélez. Esos votos, fueron el resultado del referido de papeletas que se realizó hacia la Unidad 79, correspondientes a votos emitidos el día de la elección general en la **Unidad 9 Colegio 2** del Precinto 048 de Guánica. Anejo 17, en la págs. 3 y 5 (acta acompañada por el Presidente de la CEE

a su Certificación del 21 de enero de 2021); Anejo 18, en las págs. 4 y 5 (Acta entregada por la CEE el 27 de enero de 2021); Anejo 7, Certificación de la CEE; Anejo 36, ¶¶ 2-6, en las págs. 1-2 (Declaración Jurada Sr. José Rosario Meléndez).

22. En la **Unidad 79, Colegio 10,** se adjudicaron **5 votos** a favor de Cruz Vélez. Esos votos, fueron el resultado del referido de papeletas que se realizó hacia la Unidad 79, correspondientes a votos emitidos el día de la elección general en la **Unidad 9 Colegio 3** del Precinto 048 de Guánica. Anejo 19, en las págs. 3, 4, y 8 (acta acompañada por el Presidente de la CEE a su Certificación del 21 de enero de 2021); Anejo 20, en las págs. 3, 4 y 8 (Acta entregada por la CEE el 27 de enero de 2021); Anejo 7, Certificación de la CEE; Anejo 36, ¶¶ 2-6, en las págs. 1-2 (Declaración Jurada Sr. José Rosario Meléndez).

23. En la **Unidad 79, Colegio 11,** se adjudicaron **2 votos** a favor de Cruz Vélez. Esos votos, fueron el resultado del referido de papeletas que se realizó hacia la Unidad 79, correspondientes a votos emitidos el día de la elección general en la **Unidad 10 Colegio 1** del Precinto 048 de Guánica. Anejo 21, en la págs. 3, 4 y 8 (acta acompañada por el Presidente de la CEE a su Certificación del 21 de enero de 2021); Anejo 22, en las págs. 3, 4 y 8 (Acta entregada por la CEE el 27 de enero de 2021); Anejo 7, Certificación de la CEE; Anejo 36, ¶¶ 2-6, en las págs. 1-2 (Declaración Jurada Sr. José Rosario Meléndez).

24. En la **Unidad 79, Colegio 12,** se adjudicaron [sic] **1 voto** a favor de Cruz Vélez. Esos votos, fueron el resultado del referido de papeletas que se realizó hacia la Unidad 79, correspondientes a votos emitidos el día de la elección general en la **Unidad 10 Colegio 2** del Precinto 048 de Guánica. Anejo 23, en la págs. 3 y 8 (acta acompañada por el Presidente de la CEE a su Certificación del 21 de enero de 2021); Anejo 24, en las págs. 3, 4 y 7 (Acta entregada por la CEE el 27 de enero de 2021); Anejo 7, Certificación de la CEE; Anejo 36, ¶¶ 2-6, en las págs. 1-2 (Declaración Jurada Sr. José Rosario Meléndez).

25. En la **Unidad 79, Colegio 13,** se adjudicaron [sic] **1 voto** a favor de Cruz Vélez. Esos votos, fueron el resultado del referido de papeletas que se realizó hacia la Unidad 79, correspondientes a votos emitidos el día de la elección general en la **Unidad 13 Colegio 1** del Precinto 048 de Guánica. Anejo 25, en las págs. 3, 4 y 8 (acta acompañada por el Presidente de la CEE a su Certificación del 21 de enero de 2021); Anejo 26, en las págs. 3, 4 y 8 (Acta entregada por la CEE el 27 de enero de 2021); Anejo 7, Certificación de la CEE; Anejo 36, ¶¶ 2-6, en las págs. 1-2 (Declaración Jurada Sr. José Rosario Meléndez).

26. En la **Unidad 79, Colegio 14,** se adjudicaron **13 votos** a favor de Cruz Vélez. Esos votos, fueron el resultado del referido del primer sobre de papeletas que se realizó hacia la Unidad 79, correspondientes a votos emitidos el día de la elección general en la **Unidad 13 Colegio 2** del Precinto 048 de Guánica. Anejo 27, en la págs. 3, 4 y 6 (Acta entregada por la CEE el 27 de enero de 2021); Anejo 7, Certificación de la CEE; Anejo 36, ¶¶ 2-6, en las págs. 1-2 (Declaración Jurada Sr. José Rosario Meléndez).

. . .

28. Adjudicados los votos de los Colegios 2 al 15, de la Unidad 79, las correspondientes actas que contenían dichas adjudicaciones de votos a favor de Edgardo Cruz Vélez (nominación directa), **pasaron el 21 de diciembre de 2020 a la atención y consideración de los Comisionados Alternos para ser contabilizados e incluidos en el Informe Preliminar de votos.** Anejo 6, sobre Acta de incidencias del 21 de diciembre de 2020 suscrita por los CA; Anejo 7 (Certificación de la CEE del 26 de enero de 2021). "Según acordado en reunión de comisión, los [comisionados] alternos **nos reunimos para totalizar las adjudicaciones de nominación directa**". Anejo 6, en la pág. 2 sobre Acta de incidencias del 21 de diciembre de 2020 suscrita por los CA; Anejo 7 (Certificación de la CEE del 26 de enero de 2021); "Los comisionados **solo hicimos la 'contabilización' de la nominación directa para la Unidad 79**". Anejo 6, en la pág. 6 sobre Acta de incidencias del 21 de diciembre de 2020 suscrita por los

CA; Anejo 7 (Certificación de la CEE del 26 de enero de 2021).

29. La 'contabilización' realizada por los Comisionados Alternos sobre **los votos de nominación directa para la Unidad 79, finalizó en 55 votos a favor de Edgardo Cruz, luego que uno de los votos fuera protestado por no estar incluido en las 64 variantes de nombres para serles adjudicados, según la Resolución de la CEE CEE-AC-20-546.** Anejo 6, en la pág. 3 sobre Acta de incidencias del 21 de diciembre de 2020 suscrita por los CA; Anejo 7 (Certificación de la CEE del 26 de enero de 2021).

30. Los 55 votos de la Unidad 79 (colegios 2-15 de esa unidad electoral), **fueron incluidos** (sumados) en el **Informe Preliminar de votos del 21 de diciembre de 2020** firmado por los Comisionados Alternos. Anejo 5.

. . .

35. Los **votos sobre los que esa noche y madrugada del 14 y 15 de enero de 2021 se presentó el cuestionamiento de si habían sido o no sumados antes de esa fecha, respondían a las siguientes unidades, colegios y cantidades** (Anejo 33, en las págs. 2-3, sobre Certificación del 21 de enero de 2021):

| Unidad y Colegio electoral del Precinto 048 de Guánica (al que corresponden los votos que se reclamó no saber si estaban contenidos en el Informe Preliminar) | Cantidad de votos sobre los que se tenía duda si estaban o no sumados en el Informe Preliminar del 21 de diciembre de 2020 |
|---|---|
| Unidad 7 Colegio 1 | 2 votos |
| Unidad 9 Colegio 1 | 5 votos |
| Unidad 9 Colegio 2 | 9 votos |
| Unidad 9 Colegio 3 | 5 votos |
| Unidad 10 Colegio 1 | 2 votos |
| Unidad 10 Colegio 2 | 1 voto |
| Unidad 13 Colegio 1 | 1 voto |
| Unidad 13 Colegio 2 | 13 votos |
| TOTAL DE VOTOS: | 38 VOTOS |

. . .

37. Posteriormente, el **21 de enero de 2021**, el Presidente de la CEE emitió una segunda Certificación número CEE-AC-21-011, donde

expuso por escrito lo acontecido el 14 y 15 de enero de 2021 en la CEE en relación a este asunto. Anejo 33, sobre Certificación del 21 de enero de 2021. En esa Certificación, **el Presidente de la CEE determinó sumar los mencionados 38 votos de la Unidad 79, ante la duda de si los mismos habían sido sumados o no en el Informe Preliminar.** Anejo 33, en las págs. 2-3, sobre Certificación del 21 de enero de 2021. [. . .]

. . .

47. El ejercicio aritmético de contabilizar la totalidad de las 14 actas de la Unidad 79, a saber, las 8 actas con "sospecha" de si se habían o no incluido en el Informe Preliminar, y las 6 actas adicionales que completan la Unidad 79, coincide y confirma que los 38 votos ya habían sido contados a favor de Cruz Vélez. Anejos 10, 15, 17, 19, 21, 23, 25, y 27, sobre 8 actas de la Unidad 79, y Anejos 8, 9, 12, 13, 14, y 28, sobre actas que completan la Unidad 79, y los 55 votos de esta. **En conjunto, las 14 actas de la unidad 79 totalizan los 55 votos (incluyendo los 38 que ya habían sido contados y luego fueron duplicados) que fueron contabilizados e incluidos por los Comisionados Alternos en el Informe Preliminar del 21 de diciembre de 2020,** al restarle el voto que entre los CA decidieron – unánimemente - no incluir en su contabilización por no formar parte de las variantes de nombres autorizadas por la CEE sobre Cruz Vélez. Anejo 6, en la pág. 6, sobre Acta de incidencias del 21 de diciembre de 2020, suscrita por los comisionados alternos; Anejo 7 (Certificación de la CEE del 26 de enero de 2021).

En virtud de dichas determinaciones de hecho, el foro primario emitió una *Sentencia* el 17 de febrero de 2021, en donde desestimó el recurso de revisión judicial instado por el señor Cruz Vélez. De otra parte, declaró con lugar la *Moción de sentencia sumaria* y el *Recurso de revisión* presentado por el Hon. Ismael Rodríguez Ramos y, en consecuencia, ordenó a la C.E.E. enmendar las

certificaciones emitidas los días 15 y 21 de enero de 2021 para que se restaran los treinta y ocho (38) votos duplicados y de esta forma se reflejara el número correcto de votos que obtuvo el señor Cruz Vélez. Al así hacerlo, enfatizó que las actas presentadas por el promovido en su oposición a la moción de sentencia sumaria, y de las cuales hizo eco la C.E.E., no tenían que ver con la controversia ni con las actas anejadas y disputadas en la *Certificación* del 21 de enero de 2021; es decir, con las actas relacionadas a los treinta y ocho (38) votos.

Insatisfecho, el 22 de febrero de 2021 el señor Cruz Vélez acudió al Tribunal de Apelaciones mediante *Recurso de revisión.* En este último, señaló cinco (5) errores que a su juicio cometió el Tribunal de Primera Instancia, tres (3) de los cuales versaban sobre asuntos de índole jurisdiccional y dos (2) sobre la disposición sumaria del caso.

Por otro lado, el 25 de febrero de 2021, el Hon. Ismael Rodríguez Ramos se opuso a dicha solicitud e insistió en los argumentos esbozados ante el foro primario. A su vez, en igual fecha, la C.E.E y el Comisionado Electoral del PPD sometieron sus correspondientes alegatos.

Tras evaluar los alegatos de las partes, el 3 de marzo de 2021 el foro apelativo intermedio -- panel compuesto por la Jueza Barresi Ramos, el Juez Bermúdez Torres, la Jueza Mateu Meléndez y la Jueza Rivera Marchand

-- emitió una *Sentencia*, mediante la cual confirmó al Tribunal de Primera Instancia.

En cuanto al asunto de jurisdicción sobre la materia, dicho foro resolvió que no identificó impedimento para que el Hon. Ismael Rodríguez Ramos presentara su reclamo sobre los votos duplicados en un pleito independiente. Ello, pues, en la *Orden* notificada el 26 de enero de 2021, en un proceso post-sentencia del caso SJ2020CV07062, el foro primario no atendió la controversia respecto a la duplicidad de los treinta y ocho (38) votos. Lo anterior, sumado al hecho de que, la precitada *Orden* fue una expresión interlocutoria, para la cual no se dirimió prueba alguna sobre la controversia de la duplicidad de votos y que guardó silencio sobre la certificación del 21 de enero de 2021. Consecuentemente, tampoco aplicaba la doctrina de cosa juzgada, toda vez que el objeto o asuntos de la demanda en los distintos pleitos era diferente, por lo que no existía el criterio de perfecta identidad entre las cosas.

De igual forma, el Tribunal de Apelaciones concluyó que la presunta falta de jurisdicción sobre la persona tampoco tenía apoyo en el derecho aplicable. Esto, debido a que, a la luz del tracto procesal antes expuesto y el expediente ante ese foro, surgía que tanto la C.E.E. como las partes adversamente afectadas fueron notificadas mediante correo electrónico del recurso de revisión presentado por el Hon. Ismael Rodríguez Ramos. De modo que

se cumplió con lo pautado en el Art. 13.2(1)(a) del Código Electoral de 2020, *infra*. Lo anterior, puesto que el referido artículo no menciona ni exige el emplazamiento personal.

De otra parte, en cuanto a la disposición sumaria del pleito, el foro apelativo intermedio resolvió que, ante la ausencia de documentos o declaraciones juradas que controvirtieran los hechos propuestos en la moción de sentencia sumaria del Hon. Ismael Rodríguez Ramos, procedía desestimar el recurso de revisión presentado por el señor Cruz Vélez. Ello, pues ni este último ni la C.E.E., le habían puesto en posición para concluir que los hechos, según esbozados por el Hon. Ismael Rodríguez Ramos y consignados como incontrovertidos por el foro primario, estuviesen en controversia.

Por último, y referente al señalamiento sobre la deferencia que los foros apelativos le deben guardar a las determinaciones administrativas, explicó que esta deferencia cede en situaciones como las del caso de marras, pues el Presidente de la C.E.E. mediante su actuación de instruir a que se sumaran los treinta y ocho (38) votos -- aun con claras dudas y sin corroboración de la totalidad de las documentos-- fue irrazonable. Por eso, concluyó que el foro primario no abusó de su discreción al resolver que el Hon. Ismael Rodríguez Ramos rebatió la presunción de corrección de la determinación de la C.E.E.

Aún inconformes, el pasado viernes 12 de marzo de 2021, el señor Cruz Vélez y la C.E.E. acudieron ante nos solicitando que revoquemos la determinación emitida por el foro apelativo intermedio. En esencia, insisten en los argumentos jurisdiccionales; en que la complejidad de la causa de epígrafe no debió atenderse por la vía sumaria; y que, en todo caso, las determinaciones del Presidente de la C.E.E. están cobijadas por una presunción de corrección a la cual los foros judiciales le debemos deferencia.

Trabada así la controversia, procedemos pues, a exponer las normativas que gobiernan los asuntos ante nuestra consideración.

II.

A.

Como es sabido, el derecho al voto es la columna vertebral de los principios democráticos que rigen nuestra vida como Pueblo. En esa dirección, nuestra Constitución sostiene que las leyes adoptadas por nuestra Asamblea Legislativa tienen que estar dirigidas a garantizar "[l]a expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano [o ciudadana] contra toda coacción en el ejercicio de la prerrogativa electoral". Art. II, Sec. 2, Const. ELA, LPRA, Tomo 1. Cónsono con ello, "la Asamblea Legislativa tiene la facultad y la obligación de aprobar aquella reglamentación que, sin obstaculizar innecesariamente el derecho al voto en todas sus

dimensiones, propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro". *P.A.C. v. ELA*, 150 DPR 359, 373 (2000). Véase, también, *P.S.P. v. Com. Estatal de Elecciones*, 110 DPR 400 (1980*)*; *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 DPR 248 (1980); *P.N.P. v. Tribunal Electoral*, 104 DPR 741 (1976).

A la luz de esa facultad que tienen los miembros de la Asamblea Legislativa para regular el proceso electoral en nuestro País, recientemente se aprobó la Ley Núm. 58-2020, conocida como el Código Electoral de Puerto Rico de 2020, 16 LPRA sec. 4501 *et seq.* En el referido cuerpo legal se regula, claro está, todo lo relacionado a cómo votar y cómo deben contarse los votos en determinado evento electoral.

En ese sentido, y en cuanto a la mecánica de votación, el Art. 5.1 (8) del Código Electoral de 2020, 16 LPRA sec. 4561 (8), reconoce que los electores y electoras podrán ejercer su derecho al voto de distintas maneras, a saber: el voto íntegro, el voto mixto, el voto por candidatura o el **voto por nominación directa** de personas a cargos públicos electivos. De la mano, y en cuanto a los votos por nominación directa, la C.E.E. aprobó una serie de reglamentos que guardan una estrecha relación con los procesos de escrutinio y recuento de éstos.

Al respecto, resaltan las secciones 25.6 y 25.7 del *Manual de procedimientos para el escrutinio general y*

*recuento 2020*, aprobado el 10 de noviembre de 2020, que pautan lo siguiente:

### 25.6 Papeletas No Contadas por la Máquina de Escrutinio Electrónico

a) La Mesa de Conteo Manual (Unidad 75) atenderá las papeletas no contadas referidas por las mesas de escrutinio.

b) Las papeletas no contadas se escrutarán a mano para lo cual se completará un acta por cada tipo de papeleta y un resumen el cual utilizará la OSIPE para la entrada de datos al sistema de información de resultados.

c) La Mesa de Conteo Manual acumulará, en lo posible, todas las papeletas de cada precinto previo al escrutinio correspondiente.

d) Se creará una unidad electoral especial por precinto para acumular los votos de las papeletas no contadas.

### 25.7 Mesa Especial (Unidad 79) y Papeletas en Controversia

a) La Mesa Especial (Unidad 79) estará constituida por los Comisionados Alternos de los partidos políticos o sus representantes. Dicha mesa atenderá los casos de papeletas en controversia sobre su adjudicación manual.

b) En estos casos, las papeletas en controversia se entregarán por las Mesas de Escrutinio en un sobre al Director del Escrutinio y este a su vez será quien las refiera a la Mesa Especial.

c) La Mesa Especial acumulará, en lo posible, todas las papeletas de cada precinto previo al escrutinio correspondiente.

d) Se creará una unidad electoral especial por precinto para acumular los votos de las papeletas referidas a mesa especial.

e) La Mesa Especial adjudicará o anulará, cada papeleta, según sea el caso, con el consentimiento unánime de todos sus miembros.

f) En caso de no haber tal unanimidad, las papeletas en controversia se referirán a la Comisión.

g) La Comisión a su vez adjudicará o anulará cada papeleta, según sea el caso, con el consentimiento unánime de sus miembros y de no haber tal unanimidad el asunto seguirá el trámite dispuesto en el Código Electoral sobre las decisiones de la Comisión.

h) Se creará una unidad electoral especial por precinto distinta a la de la Mesa Especial para acumular los votos de las papeletas referidas a la Comisión.

i) Asimismo, los votos de cualesquiera papeletas que se determinaren su adjudicación o anulación en el Tribunal se acumularán en otra unidad especial que se creará en el precinto que aplique y distinta a las antes mencionadas.

En cambio, y cuando no existiera consenso en la adjudicación de una papeleta, la sección 18.9 del *Manual* dispone que:

a) En el caso de papeletas dudosas que no puedan ser resueltas en las mesas, estas serán sometidas, en la misma mesa, en orden ascendente, a los supervisores de línea, supervisores de piso y la mesa especial compuesta por los Comisionados Alternos. Si no se logra el consenso, las mismas serán entregadas en sobre sellado al director del Escrutinio conforme se dispone en el Reglamento de Elecciones Generales y Escrutinio General 2020, para que estas sean sometidas para la determinación final a la Comisión. De esta mesa haber referido papeletas a mesa especial o a la Comisión[,] la adjudicación de las papeletas enviadas será conforme a las Reglas y Criterios de Adjudicación Manual.

b) Una vez la Comisión haga la determinación final de todas las papeletas que le hayan sido sometidas de un mismo precinto, se procederá a preparar un Acta de Escrutinio especial por una junta autorizada por la Comisión. Dicha Acta se distribuirá conforme con los procedimientos establecidos. Las papeletas se mantendrán bajo la custodia del Secretario.

B.

Por otro lado, y como una mayoría de este Tribunal ha señalado,[11] el Código Electoral de 2020 -- dada la naturaleza *sui generis* de los procedimientos que atiende -- estableció determinados mecanismos para que una persona que no esté conforme con los resultados de una elección o determinación administrativa de la C.E.E. pueda impugnar los mismos. Lo anterior, bien sea a través del recurso de impugnación de elección o el de revisión judicial.

Así pues, el Art. 10.15 del Código Electoral de 2020, 16 LPRA sec. 4764, establece que cualquier candidato o candidata que desee impugnar la elección de otro, deberá presentar ante el Juez de la Sala de la Región Judicial que se haya designado conforme a la precitada ley -- y dentro de los diez (10) días siguientes a la fecha de la notificación de la certificación de elección -- un escrito juramentado exponiendo las razones en virtud de las cuales fundamenta su impugnación. Dichas razones deberán ser de tal naturaleza que, de probarse, serán suficientes para cambiar el resultado de la elección.

El discutido Art. 10.15 del Código Electoral de 2020, *supra*, también dispone que:

. . .

---

[11] Véase, *Manuel A. Natal Albelo v. Miguel A. Romero Lugo y otros*, 2021 TSPR 26, 206 DPR ____ (2021) (Oronoz Rodríguez, voto particular de conformidad) (Martínez Torres, voto particular de conformidad) (Estrella Martínez, voto particular de conformidad) (Colón Pérez, voto particular de conformidad).

Una copia fiel y exacta del escrito de impugnación será notificada al Candidato impugnado y se le entregará personalmente, dentro de los cinco (5) días siguientes a su presentación.

El candidato cuya elección fuese impugnada tendrá que presentar ante el Tribunal una contestación bajo juramente dentro de los diez (10) días siguientes a la fecha en que recibiere la notificación del escrito de impugnación y certificará haber notificado y entregado personalmente copia de su contestación al impugnador o a su representante legal. Se entenderá que la persona cuya elección fue impugnada acepta la impugnación como cierta de no contestar en dicho término.

La notificación, escrito y contestación prescritos en esta Ley, podrán ser diligenciados por cualquier persona competente para testificar y se diligenciarán mediante entrega personal a las respectivas partes, a sus representantes electorales, conforme a lo establecido en las Reglas de Procedimiento Civil o en la residencia u oficina de la persona a quien fueren dirigidas. A los fines de este Artículo, el representante electoral de un candidato por un partido política será el integrante de la Comisión Local del precinto de su domicilio que represente a su partido político. (Énfasis suplido). *Íd.*

Con similar lógica, el Art. 13.2(1) del Código Electoral de 2020, 16 LPRA sec. 4031, en lo concerniente, dispone que cualquier Comisionado Electoral o parte adversamente afectada por una determinación de la Comisión Estatal de Elecciones o de la Comisión Local de Elecciones podrá recurrir ante el Tribunal Primera Instancia mediante la presentación de un recurso de revisión, dentro de los **diez (10) días** siguientes a la notificación de la resolución, determinación u orden que desea sea revisada. *Ríos Martínez, Com. Alt. PNP v. CLE*, 196 DPR 289, 300

(2016). Seguido, el precitado artículo establece que, **"[l]a parte promovente tendrá la responsabilidad de notificar, dentro de dicho término, copia del recurso de revisión a través de la Secretaría de la Comisión, así como a cualquier otra parte adversamente afectada, dentro del término para recurrir al Tribunal"**. (Énfasis nuestro). Artículo 13.2 del Código Electoral de 2020, *supra*. El inciso (b), del precitado artículo añade que:

> [e]l Tribunal de Primera Instancia realizará una vista en su fondo, recibirá evidencia y formulará las determinaciones de hecho y las conclusiones de derecho que correspondan. El Tribunal deberá resolver la solicitud de revisión dentro de un término no mayor de veinte (20) días, contado a partir de la fecha en que el caso quede sometido.

Como se puede apreciar, tal y como aclaramos recientemente -- para el contexto del Art. 10.15 del Código Electoral de 2020, 16 LPRA sec. 4764 --, en el Art.13.2, *supra*, no se hace mención alguna al concepto emplazamiento o referencia específica a la Regla 4.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 4.4, sobre emplazamiento personal. Véase, *Manuel A. Natal Albelo v. Miguel A. Romero Lugo y otros*, supra, (Oronoz Rodríguez, voto particular de conformidad) (Martínez Torres, voto particular de conformidad) (Estrella Martínez, voto particular de conformidad) (Colón Pérez, voto particular de conformidad).

Inclusive, en el Art. 13.2 del referido cuerpo legal, *supra*, nada se dice sobre cómo se debe gestionar la notificación del recurso de revisión judicial. De manera

que se puede colegir que, a propósito de los procesos que atiende el Código Electoral de 2020, lo verdaderamente importante, conforme exige el debido proceso de ley, es que la parte afectada o contra quien se presenta la acción, reciba una notificación que le permita conocer la existencia de ésta y oportunamente ejerza su derecho a ser oída y defenderse.

III.

Por otro lado, y por ser en extremo pertinente para la correcta disposición de la controversia que nos ocupa, cabe repasar lo dispuesto en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V., R. 36, la cual regula todo lo concerniente a la moción de sentencia sumaria, mecanismo procesal que se utiliza en aquellos litigios que no presentan controversias genuinas de hechos materiales y que, por consiguiente, no ameritan la celebración de un juicio en su fondo, pues lo único que resta es dirimir una controversia de derecho. *Mejías Montalvo v. Carrasquillo Martínez*, 185 DPR 288, 299 (2012); *Nieves Díaz v. González Massas*, 178 DPR 820, 847 (2010); *Vera Morales v. Dr. Bravo Colón*, 161 DPR 308, 331-32 (2004). De ahí que, el propósito principal del mecanismo de sentencia sumaria es la solución justa, rápida y económica de los litigios civiles. *Zapata Berríos v. J.F. Montalvo Cash & Carry Inc*, 189 DPR 414, 430 (2013); *Const. José Carro v. Mun. de Dorado*, 186 DPR 113, 128 (2012); *Mejías Montalvo v. Carrasquillo Martínez*, supra.

Consecuentemente, la Regla 36.1 del referido cuerpo legal, 32 LPRA Ap. V, R. 36.1, la cual regula el contenido de una moción de sentencia sumaria, establece que un demandante podrá presentar dicha moción siempre y cuando esté fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. *Bobé v. UBS Financial Services Incorporated of Puerto Rico*, 198 DPR 6, 20 (2017); *Oriental Bank & Trust v. Perapi S.E.*, 192 DPR 7, 25 (2014). Véase, además, *Zapata Berríos v. J.F. Montalvo*, supra, pág. 452. De la mano, la Regla 36.2 y 36.3 del referido cuerpo reglamentario, 32 LPRA Ap. V, R.36.2-36.3, disponen los requisitos de forma que deberá observar la parte promovente de la vía sumaria.

De otro lado, la parte que se opone a que se dicte sentencia sumariamente también deberá cumplir con ciertas exigencias de ley. Véase, Regla 36.3 de Procedimiento Civil, *supra*. Entre éstas, **al contestar una solicitud para que se dicte sentencia sumaria, el promovido deberá presentar una relación concisa y organizada de aquellos hechos esenciales y pertinentes que, a su juicio, estén en controversia, citando específicamente los párrafos según fueron enumerados por el promovente de la moción.** *Bobé v. UBS Financial Services Incorporated of Puerto Rico*, supra, pág. 21; *Mun. de Añasco v. ASES et al.*, 188 DPR 307, 326 (2013); *Ramos Pérez v. Univisión*, 178 DPR 200, 221 (2010).

Asimismo, la moción en oposición a que se dicte sentencia sumaria contendrá una enumeración de los hechos que no están en controversia, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible donde se establezcan los mismos. *Íd.*

**Es decir, la parte promovida por una moción de sentencia sumaria deberá refutar los hechos materiales que están en disputa mediante la presentación de evidencia sustancial.** *Mun. de Añasco v. ASES et al.*, supra; *Nieves Díaz v. González Massas*, supra, pág. 848; *Jusino Figueroa v. Walgreens of San Patricio*, 155 DPR 560, 577 (2001). **Ello es así, puesto que la parte que se opone a que se dicte sentencia sumaria no puede descansar en meras alegaciones.** *Meléndez González v. M. Cuebas*, 193 DPR 100, 136 (2015); *Ramos Pérez v. Univisión*, supra. Véase, J. A. Cuevas Segarra, *Tratado de derecho procesal civil*, San Juan, Pubs. JTS, 2011, T. I, pág. 1041.[12]

**Lo anterior, toda vez que cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una que permita concluir la existencia de una controversia real y sustancial sobre hechos relevantes y pertinentes.** *Abrams Rivera v. ELA,* 178 DPR 914, 932 (2010); *Nieves Díaz v. González Massas*, supra, pág. 848; *Ramos Pérez v. Univisión*, *supra*, pág.

---

[12] Como bien nos menciona el profesor Ernesto L. Chiesa Aponte, al comentar la Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110, "[e]l lenguaje de la regla resulta filosóficamente correcto, pues **quien afirma la existencia de algo, tiene la obligación de presentar evidencia para demostrarlo**". (Énfasis suplido). E.L. Chiesa Aponte, *Reglas de evidencia comentadas*, San Juan, Ed. Situm, 2016, pág. 49.

214. Claro está, el hecho de que la parte promovida no presente prueba que controvierta la evidencia presentada por la parte promovente de la moción de sentencia sumaria no implica necesariamente que dicha moción procederá automáticamente si efectivamente existe una controversia sustancial sobre hechos esenciales y materiales. *Mun. de Añasco v. ASES et al.*, *supra*, pág. 327; *Jusino Figueroa v. Walgreens of San Patricio,* supra, pág. 578; *Piovanetti García v. Touma*, supra, pág. 774.

Por tanto, un tribunal podrá dictar sentencia sumaria si de las alegaciones, deposiciones, contestaciones, interrogatorios y admisiones ofrecidas, junto a las declaraciones juradas -- si las hubiere -- surge que no existe una controversia real sustancial en cuanto a ningún hecho material y solo restaría por resolver una controversia de estricto derecho. Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3; *Pepsi-Cola Manufacturing v. Mun. Cidra et al.*, 186 DPR 713, 755-56 (2012); *Piovanetti García v. Touma*, 178 DPR 745, 775 (2010). Véase, además, *Viruet Candelaria v. City of Angels,* 194 DPR 271, 283 (2015). En suma, una moción de sentencia sumaria no procederá cuando: (1) existan hechos materiales y esenciales controvertidos; (2) haya alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o (4) como cuestión de derecho,

no proceda. *Szendrey v. Consejo de Titulares del Condominio Metropolitan Professional Park*, supra, pág. 167 (2011); *Pepsi-Cola Manufacturing v. Mun. Cidra et al.*, supra, pág. 757; *Vera Morales et al. v. Dr. Bravo Colón*, supra, págs. 333-34.

Resta señalar que, al evaluar la procedencia de una sentencia sumaria, los foros apelativos nos encontramos en la misma posición que el Tribunal de Primera Instancia. *Rivera Matos v. ELA*, 2020 TSPR 89, 204 DPR ___ (2020); *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019)*; Meléndez González v. M. Cuebas, supra, pág. 115. Por esta razón, hemos expresado que "[e]n el proceso de evaluar una sentencia sumaria dictada por el foro primario, los tribunales revisores v[enimos] llamados a examinar el expediente de novo y verificar que las partes cumplieron con las exigencias de la Regla 36.3[ esto es, los requisitos de forma]". Rivera Matos v. ELA, supra; Meléndez González v. M. Cuebas, supra. De encontrar que los hechos materiales realmente están incontrovertidos, nos corresponde entonces revisar de novo si el foro primario aplicó correctamente el Derecho. González Santiago v. Baxter Healthcare, supra; Meléndez González v. M. Cuebas, supra, pág. 118.* Ahora bien, en ese examen de novo, el estándar de revisión sugerido persigue evitar que los tribunales apelativos revoquen sentencias emitidas sumariamente por el foro primario frente a un argumento

escueto de que existe hechos en controversia. *Meléndez González v. M. Cuebas*, supra, pág. 119.

IV.

Por último, conviene recordar aquí que los tribunales de primera instancia gozan de amplio margen de discreción para llevar a cabo los procedimientos que presiden. *Citibank N.A. v. Cordero Badillo*, 200 DPR 724 (2018). Véase, además, *Pueblo v. Santiago Cruz*, 2020 TSPR 99, 205 DPR ___ (2020). Esa discreción se caracteriza por el "poder para decidir en una u otra forma, esto es, para escoger entre uno o varios cursos de acción". *García v. Padró*, 165 DPR 324, 334 (2005); *Pueblo v. Ortega Santiago*, 125 DPR 203, 211 (1990); *Pueblo v. Sánchez González*, 90 DPR 197, 200 (1964).

En consecuencia, los tribunales apelativos -- salvo contadas excepciones -- no intervendrán con la forma en que los foros primarios manejen sus casos. Véase, *Citibank N.A. v. Cordero Badillo*, supra, pág. 736. Véase también, *Ramos Milano v. Wal-Mart*, 168 DPR 112, 121 (2006); *Ortiz Rivera v. Agostini,* 192 DPR 187 (1965). Por eso, hemos recalcado que aquellas determinaciones que un tribunal inferior haga en el sano ejercicio de su discreción, "deben ser respetadas por los foros apelativos, a menos, claro está, que se demuestre arbitrariedad, un craso abuso de discreción, una determinación errónea que cause grave perjuicio a una de las partes, o la necesidad de un cambio de política procesal o sustantiva". *Rebollo López v. Gil*

*Bonar*, 148 DPR 673, 678 (1999). Véase también, *Citibank N.A. v. Cordero Badillo*, supra; *Ramos Milano v. Wal-Mart*, supra.

Es, pues, a la luz de la normativa antes esbozada que procedemos a disponer de la controversia ante nuestra consideración.

V.

Como mencionamos anteriormente, en el presente caso tanto el señor Cruz Vélez como la C.E.E., aducen -- por varias razones que atenderemos a continuación -- que el Tribunal de Apelaciones erró al confirmar el Tribunal de Primera Instancia. No les asiste la razón. Veamos porqué.

A.

En primer lugar, en el caso de marras -- y contrario a lo que intima el señor Cruz Vélez en varios de sus señalamientos de error -- no cabe hablar de la doctrina de cosa juzgada. Como conocemos, dicha doctrina exige se cumplan con unos requisitos básicos, como el de perfecta identidad de las cosas. Véase, Art. 1204 del Código Civil de 1930, 31 LPRA sec.3343. Véase, también, *Presidential v. Transcaribe*, supra; *A & P Gen. Contractors v. Asoc. Caná*, 110 DPR 753, 764 (1981); *Lausell Marxuach v. Díaz de Yáñez*, 103 DPR 533, 535 (1975). Ese requisito no se cumple en el presente pleito por dos (2) razones.

*Primero*, si bien es cierto que en un proceso post-sentencia -- relacionado al caso que precedió el que hoy está ante nuestra consideración -- el Tribunal de Primera

Instancia emitió una *Orden* expresando, sin más, que declaraba sin lugar la petición del Hon. Ismael Rodríguez Ramos y disponía que la certificación emitida por la C.E.E del 15 de enero de 2021 cumplía con la *Sentencia* dictada por ese tribunal, no es menos cierto que ese foro no aquilató prueba alguna referente a la alegación sobre la duplicidad de votos. *Segundo*, al ser lo primero así, no existe pues una perfecta identidad de las cosas que fueron objeto o materia de controversia en aquel pleito y éste. Lo que es más, las meras alegaciones no prueban los casos. Así también, y por no existir identidad *de las cosas*, tampoco cabe hablar de la modalidad de impedimento colateral por sentencia.[13]

A la luz de lo anterior, es forzoso concluir que el foro apelativo intermedio no erró al determinar -- al igual que lo hizo el Tribunal de Primera Instancia -- que existe jurisdicción sobre la materia en el caso que nos ocupa.

B.

En segundo lugar, en el presente caso tampoco procede invocar la defensa afirmativa de falta de jurisdicción sobre la persona. Como ya hemos discutido, la naturaleza de los procedimientos que atiende el Código Electoral de 2020, *supra*, justifica que ese cuerpo de ley disponga de

---

[13] En lo referente al señalamiento de que tampoco existe jurisdicción sobre la materia porque el Hon. Ismael Rodríguez Ramos dejó vencer el término de diez (10) días que dispone el Art. 13.3 del Código Electoral de 2020, *supra*, para apelar la determinación judicial hecha en el procedimiento post-sentencia del caso anterior, no vemos como ello incide en el presente pleito.

mecanismos alternos para notificar conforme derecho a las partes afectadas por la impugnación de una elección al amparo del Art. 10.15, *supra*, o por un recurso de revisión judicial bajo el Art. 13.2, *supra*.

En ese sentido, y ante el reclamo de que el Hon. Ismael Rodríguez Ramos no diligenció emplazamientos cuando presentó su recurso de revisión en el caso civil núm. SJ2021CV00438, dejamos claro en el derecho aplicable que tal emplazamiento no se requiere. De ahí que, las partes comparecientes sí fueron debidamente notificadas del referido recurso de revisión mediante correo electrónico, en el cual se incluyó copia de éste y sus anejos. Esta gestión surge de la certificación que se hizo al final de precitado recurso de revisión, según lo requiere el Art. 13.2, *supra*.[14] Véase, de manera análoga lo resuelto por una mayoría de este Foro en *Manuel A. Natal Albelo v. Miguel A. Romero Lugo y otros*, supra.

Ante ello, concluimos que el recurso de revisión que presentó el Hon. Ismael Rodríguez Ramos se notificó dentro del plazo que dispone el Art. 13.2 del Código Electoral de 2020, *supra*. Es decir, que habiéndose emitido las *Certificaciones* que contienen los treinta y ocho (38) votos impugnados, en las fechas 15 y 21 de enero de 2021, y presentado y notificado el recurso de revisión del Hon. Ismael Rodríguez Ramos el 25 de enero de 2021, este último

---

[14] De una búsqueda rápida en SUMAC, bajo el alfanumérico SJ2021CV00438, puede encontrarse el referido recurso y corroborarse la certificación hecha en la página 19 del citado documento.

estaba dentro del término prescrito para ello. A tales efectos, resolvemos que el Tribunal de Apelaciones no erró al determinar, al igual que el foro primario, que existe jurisdicción sobre las partes comparecientes.

De paso, y referente a la alegación del señor Cruz Vélez de que tras la consolidación del caso SJ2021CV00438 con el SJ2021CV00287, automáticamente se eximió al Hon. Ismael Rodríguez Ramos de emplazar conforme se dispone en la Regla 4.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 4.4, nos remitimos a la discusión en los párrafos anteriores y la discusión hecha en la sección II-B de este escrito. Y aclaramos, además, que, no se trata de automatismos, sino que conforme a la naturaleza de los procedimientos que con celeridad se deben atender en estos escenarios, el debido proceso queda cubierto cuando se notifica, en este caso, el recurso de revisión. Por tanto, en el presente caso no se le eximió automáticamente a ninguna parte de cumplir con la notificación que requiere el Art. 13.2 del Código Elector de 2020, *supra*.

C.

En tercer lugar, hemos tenido la oportunidad de examinar -- detenida y detalladamente -- los escritos presentados anteriormente por las partes y, de entrada, debemos mencionar que la moción de sentencia sumaria instada por el Hon. Ismael Rodríguez Ramos cumplió con los requisitos de forma que exige la Regla 36 de Procedimiento

Civil, *supra*, no así la oposición del señor Cruz Vélez.[15]

**Éste último, -- tampoco lo hizo la C.E.E. --, 1) no**

---

[15] El Hon. Ismael Rodríguez Ramos acompañó su moción de sentencia sumaria, de los siguientes documentos: Anejo 1- Certificación Preliminar de la Comisión Estatal de Elecciones emitida el 7 de noviembre de 2020; Anejo 2- Relación de Precintos por Distritos Senatoriales y Representativos; Anejo 3- Manual de Procedimientos para el Escrutinio General y Recuento 2020 aprobado el 10 de noviembre de 2020; Anejo 4- Resultado Municipio de Guánica (Noche del evento); Anejo 5- Informe Preliminar de Consolidación de Nominación Directa de Alcalde de Guánica revisado el 21 de diciembre de 2020; Anejo 6- Acta de Incidencias del Escrutinio General certificada el 21 de diciembre de 2020 (Unidad 79); Anejo 7- Certificación de la Comisión Estatal de Elecciones de 26 de enero de 2021; Anejo 8- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 2); Anejo 9- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 3); Anejo 10- Acta de Incidencias del Escrutinio General (Unidad 7, Colegio 1); Anejo 11- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 7); Anejo 12- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 4); Anejo 13- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 5); Anejo 14- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 6); Anejo 15- Acta de Incidencias del Escrutinio General (Unidad 9, Colegio 1); Anejo 16- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 8); Anejo 17- Acta de Incidencias del Escrutinio General (Unidad 9, Colegio 2); Anejo 18- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 9); Anejo 19- Acta de Incidencias del Escrutinio General (Unidad 9, Colegio 3); Anejo 20- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 10); Anejo 21- Acta de Incidencias del Escrutinio General (Unidad 10, Colegio 1); Anejo 22- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 11); Anejo 23- Acta de Incidencias del Escrutinio General (Unidad 10, Colegio 2); Anejo 24- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 12); Anejo 25- Acta de Incidencias del Escrutinio General (Unidad 13, Colegio 1); Anejo 26- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 13); Anejo 27- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 14); Anejo 28- Acta de Incidencias del Escrutinio General (Unidad 13, Colegio 2); Anejo 29- Acta de Incidencias del Escrutinio General (Unidad 79, Colegio 15); Anejo 30- Certificación de la Comisión Estatal de Elecciones emitida el 31 de diciembre de 2020; Anejo 31- Convocatoria del Secretario Sustituto de la Comisión Estatal de Elecciones fechada el 12 de enero de 2021; Anejo 32- Certificación de la Comisión Estatal de Elecciones emitida el 15 de enero de 2021; Anejo 33- Certificación de Desacuerdo de la Comisión Estatal de Elecciones emitida el 21 de enero de 2021; Anejo 34 Convocatoria del 26 de enero de 2021; Anejo 36- Declaración Jurada de José Rosario Meléndez del 1 de febrero de 2021; Anejo 36(a)- Actas de Incidencias del Escrutinio General (Unidad 79, Colegio 11); Anejo 36 (b)- Actas de Incidencias del Escrutinio General (Unidad 79, Colegio 14); Anejo 37- Declaración Jurada Julio Méndez González del 1 de febrero de 2021 y Anejo 38-Declaración Jurada Joel Rodríguez Almodóvar del 1 de febrero de 2021.

Además, cabe destacar que el 2 de febrero de 2021, el Hon. Ismael Rodríguez Ramos presentó una moción para suplementar su solicitud de sentencia sumaria en la que acompañó los siguientes documentos: Anejo 1- Declaración Jurada de Nelson Javier Rodríguez Vargas del 2 de febrero de 2021 y Anejo 2- Declaración Jurada de Enid López Maldonado del 2 de febrero de 2021.

**presentó una relación concisa y organizada de los hechos esenciales y pertinentes que, a su juicio, estuviesen en controversia, citando específicamente los párrafos según fueron enumerados por el promovente de la moción, y 2) no refutó los hechos materiales que entendía estaban en disputa mediante la presentación de la correspondiente evidencia sustancial.[16]**

En este punto resulta necesario aclarar que, los anejos a los que alude la C.E.E. en su escrito de *certiorari* y que nos remiten a lo discutido por el señor Cruz Vélez en su entonces *Oposición a la moción de sentencia sumaria*, no logran controvertir los hechos propuestos por el Hon. Ismael Rodríguez Ramos. De una visita a los referidos anejos observamos que nada tienen

---

[16] En apoyo a su escrito, el señor Cruz Vélez anejó lo siguiente: Anejo 1- Resolución del Tribunal Supremo emitida el 15 de enero de 2021; Anejo 2- Resolución del Tribunal Supremo emitida el 20 de enero de 2021; Anejo 3- Resolución del Tribunal Supremo emitida el 21 de enero de 2021; Anejo 4- Moción Urgente en Solicitud de Remedios por Incumplimiento de la CEE con la Sentencia según confirmada por el Tribunal Supremo presentada por Ismael Rodríguez Ramos el 25 de enero de 2021 en el caso SJ2020CV07062; Anejo 5- Orden emitida por el Tribunal de Primera Instancia el 25 de enero de 2021 en el caso 5J2020CV07062; Anejo 6- Moción en cumplimiento de orden presentada por el Hon. Francisco J. Rosado Colomer el 26 de enero de 2021 en el caso SJ2020CV07062; Anejo 7- Orden emitida por el Tribunal de Primera Instancia el 26 de enero de 2021 en el caso SJ2020CV07062; Anejo 8 Moción de Reconsideración presentada por Ismael Rodríguez Ramos el 26 de enero de 2021 en el caso 5J2020CV07062; Anejo 9- Resolución emitida por el Tribunal de Primera Instancia el 26 de enero de 2021; Anejo l0(a)- Hoja de Trámite del 17 de diciembre de 2020; Anejo 10(b)- Hoja de Trámite de Escrutinio emitida el 17 de diciembre de 2020; Anejo 11- Hoja de Trámite de Escrutinio emitida el 18 de diciembre de 2020; Anejo 12(a)- Acta de Incidencias de Escrutinio emitida el 17 de noviembre de 2020; Anejo 12(b) Resumen de Acta de Escrutinio Municipal emitida el 17 de diciembre de 2020 y Anejo 12(c)- Acta de Escrutinio Municipal.

que ver con la controversia de las actas relacionadas a la Unidad 79 y los treinta ocho (38) votos en cuestión.[17]

Por otra parte, y luego de escrudiñar detenidamente los extensos expedientes ante nuestra consideración, nos hacemos ecos de las cuarenta y siete (47) determinaciones de hechos incontrovertidos que hizo el Tribunal de Primera Instancia y que acogió el Tribunal de Apelaciones, por estar todas sustentadas en los anejos a los cuales hacen referencia. **En específico, enfatizamos que "[e]n conjunto, las 14 actas de la unidad 79 totalizan los 55 votos**

---

[17] Véase, *Certiorari* de la C.E.E., pág. 16. Al respecto, huelga aclarar que los anejos 10(a)(b), 11, 12(a)(b)(c), que son los anejos que el señor Cruz Vélez incluyó en su *Oposición a la moción de sentencia sumaria*, -- y que, obsérvese, éste último no alude a ellos en su petición de *certiorari* ante nos --, notamos que el **Anejo 11** es una *Hoja de Trámite* con fecha de 18 de diciembre de 2020 y que contiene, en su mayoría las Unidades y Colegios correspondientes a las actas de incidencia que crearon la disputa la madrugada del 15 de enero de 2021, según se refleja a su vez en la *Certificación* del 21 de enero de 2021. Por eso, dichas actas son también las que señala el Hon. Ismael Rodríguez Ramos en sus escritos como aquellas actas que se contaron y sumaron en el *Informe Preliminar* del 21 de diciembre de 2020, por lo que razonó que la decisión de sumarlas el 15 de enero de 2021 tuvo el efecto de duplicar determinados votos. Y es que, si bien esas Unidades y Colegios no parecían haberse contabilizado y sumados el 18 de diciembre de 2020, lo cierto es que de un detenido examen a los anejos vemos que esas mismas actas de incidencia fueron tachadas y finalmente convertidas a la Unidad 79 el 20 de diciembre de 2020, quedando de la siguiente forma: U7-C1→ U79-C7; U9-C2→U79-C9; U9-C3→U79-C10; U10-C1→U79-C11; U10-C2→U79-C12; U13-C1→U79-C13; U13-C2→U79-C14(primer sobre). Véase, por ejemplo, *Apéndice del certiorari* de la C.E.E, págs. 417, 455, 476, 496, 499, 516, 535, 543. Asimismo, de otra **Hoja de Trámite con fecha del 20 de diciembre de 2020**, se desprende que esas mismas actas de incidencia, entre otras, fueron las que quedaron dentro de la Unidad 79 el 20 de diciembre de 2020 y que se sumaron en el *Informe Preliminar* del 21 de diciembre de 2020. Véase, *Apéndice del certiorari* de la C.E.E, pág. 390.

Por otro lado, y en cuanto a los **Anejos 10(a)(b)**, estos hacen referencia a unas actas que fueron referidas a la mesa de los Comisionados Alternos el 17 de diciembre de 2020, sin embargo, no surge que tales actas finalmente hayan sido convertidas a la Unidas 79. Ahora bien, cuando vemos estos últimos anejos junto al **Anejo 12(c)** concluimos que las actas de incidencia que estaban en la *Hoja de Trámite* del 17 de diciembre quedaron bajo la Unidad 77 con 61 votos de los cuales 50 fueron a favor del señor Cruz Vélez. Los **Anejos 12(a)(b)** no inciden sobre la controversia ante nos.

**(incluyendo los 38 que ya habían sido contados y luego fueron duplicados) que fueron contabilizados e incluidos por los Comisionados Alternos en el Informe Preliminar del 21 de diciembre de 2020…".** (Énfasis suplido). Véase, *Apéndice del certiorari* del señor Cruz Vélez, pág. TS-1235.

Para llegar a tal conclusión bastaría con realizar un examen y comparación pausada de las actas de incidencia utilizadas para el *Informe Preliminar* del 21 de diciembre de 2020 y las actas anejadas a la *Certificación* del 21 de enero de 2021, de las cuales se desprende lo siguiente: 1) las actas de incidencia de la Unidad 79 se componen de varias páginas, en donde la primera, en su encabezado, contiene la Unidad y Colegio original a la que responde; 2) varias de estas actas (no tachadas) y con fecha de 18 de diciembre de 2020, fueron las mismas que se utilizaron para preparar el *Informe Preliminar* y la *Certificación*; 3) para el *Informe Preliminar* copia de estas actas fueron tachadas y convertidas en la Unidad 79 e iniciadas con "ok/ 20 de diciembre de 2020/ CA"; 4) del *Informe Preliminar* se desprende que estos votos fueron contabilizados, adjudicados y sumados en el precitado informe que suscribieron los Comisionados Alternos el 21 de diciembre de 2020; 5) los votos ya contados, adjudicados y sumados en el *Informe Preliminar* fueron

contados, adjudicados y sumados en la *Certificación* del 21 de enero de 2021.[18]

Es decir, en el presente caso -- como correctamente lo determinaron el Tribunal de Primera Instancia y el Tribunal de Apelaciones, apoyados ambos en abundante evidencia --, al realizarse el escrutinio final de papeletas por nominación directa a la Alcaldía del Municipio de Guánica el pasado 14 y 15 de enero de 2021, se duplicaron ciertos votos a favor del señor Cruz Vélez. Si bien no hubo una vista como tal, lo cierto es que las partes tuvieron la oportunidad de presentarle al tribunal toda la evidencia que estuviese en su poder para probar sus alegaciones, unas partes lo hicieron otras no. Sabido es que, el mecanismo de sentencia sumaria no es uno ajeno a los procesos electorales y, como cuestión de hecho, el Código Electoral de 2020, *supra*, no lo veda.

Al así actuar, hemos sido consistentes con la norma de que "la Regla 36 no queda excluida como cuestión de derecho de ningún procedimiento en particular ...". *García López v. Méndez García*, 88 DPR 363, 380 (1963). Véase, *Ramos Pérez v. Univisión*, 178 DPR 200, 219-20 (2010). Es decir, nuestra jurisprudencia es clara en que no importa

---

[18] Para mejor comprensión, comparece una y otra acta en el *Informe Preliminar* del 21 de diciembre de 2020 y en la *Certificación* de 21 de enero de 2021, en las siguientes páginas del *Apéndice del certiorari* del señor Cruz Vélez (TS) y *Apéndice del certiorari* de la C.E.E (págs.):  TS-110-TS-121 → págs. 405-422; TS-134-TS-146 → págs. 442-463; págs. TS-173-TS-184 → págs. 464-483; TS-147-TS-160 → págs. 484-503; TS-161-TS-172 → págs. 504-522; TS-185-TS-196 → págs. 523-542; TS-197-TS-209 → págs. 543-551.

lo complejo que sea un pleito, si de una Moción de Sentencia Sumaria bien fundamentada surge que no existe controversia real en cuanto a los hechos materiales del caso, puede dictarse Sentencia sumariamente. *Meléndez González v. M. Cuebas*, 193 DPR 100, 112 (2015).

D.

Por último, y en armonía con todo lo antes expresado, somos de la opinión que el Presidente de la C.E.E. se excedió en su determinación de añadir treinta y ocho (38) votos que, a todas luces, y de un cálculo matemático básico, resulta evidente que se contabilizaron dos (2) veces. Pues lo que es más, aun cuando podría resultarle sospecho al Presidente de la C.E.E. que las actas denunciadas -- y discutidas durante la madrugada del 15 de enero de 2021 --, presuntamente no se encontraban en el maletín que correspondía, nos resulta más alarmante que se ignorara toda la evidencia de la cual se desprende, -- según quedó mostrado en los anejos a los cuales aluden las determinaciones de hechos del foro primario --, que dichos votos ya se habían contabilizado, adjudicado y sumados en el *Informe Preliminar* del 21 de diciembre de 2021.

Consecuentemente, dicha actuación no puede ser merecedora de deferencia por parte de los foros judiciales revisores. Fue ésta la que produjo un error manifiesto en las certificaciones emitida el 15 y 21 de diciembre de 2020; errores que deben ser corregidos.

VI.

En fin, y a modo de epílogo, si bien resultaría simpático resolver a favor de un candidato por nominación directa por el esfuerzo que ello significa, lo cierto es que -- como cuestión de hecho --, en una apretada e histórica contienda, el señor Cruz Vélez no obtuvo la mayoría de los votos.  Esa mayoría de votos la obtuvo, en esta ocasión, el Hon. Ismael Rodríguez Ramos.

VII.

No albergando duda de lo anterior, y por los fundamentos antes expuestos, estamos conforme con el curso de acción seguido por este Tribunal en el caso de marras.


Ángel Colón Pérez
Juez Asociado



COMISIÓN ESTATAL DE ELECCIONES DE PUERTO RICO

**Informe Preliminar de Consolidación de Nominación Directa de Alcalde de Guánica**

| Nombre | Unidad | Colegio 1 | Colegio 2 | Colegio 3 | Totales |
|---|---|---|---|---|---|
| Edgardo Cruz Vélez | 1 | 71 | 68 | 53 | 192 |
| Edgardo Cruz Vélez | 2 | 64 | 55 | 55 | 174 |
| Edgardo Cruz Vélez | 3 | 67 | 74 | 79 | 220 |
| Edgardo Cruz Vélez | 4 | 36 | | | 36 |
| Edgardo Cruz Vélez | 5 | 51 | | | 51 |
| Edgardo Cruz Vélez | 6 | 70 | 61 | 75 | 206 |
| Edgardo Cruz Vélez | 7 | 57 | 62 | | 119 |
| Edgardo Cruz Vélez | 8 | 63 | 66 | | 129 |
| Edgardo Cruz Vélez | 9 | 110 | 81 | 67 | 258 |
| Edgardo Cruz Vélez | 10 | 36 | 58 | | 94 |
| Edgardo Cruz Vélez | 11 | 40 | | | 40 |
| Edgardo Cruz Vélez | 12 | 32 | 46 | | 78 |
| Edgardo Cruz Vélez | 13 | 93 | 48 | 78 | 219 |
| Edgardo Cruz Vélez | 14 | 46 | | | 46 |
| Edgardo Cruz Vélez | 74 | | | 0 | 0 |
| Edgardo Cruz Vélez | 77 | | | 412 | 412 |
| Edgardo Cruz Vélez | 79 | | | 55 | 55 |
| Edgardo Cruz Vélez | 80 | | | 6 | 6 |
| Totales | | 836 | 619 | 880 | 2335 |

Revisado en Mesa de Comisionados Alternos el lunes, 21 de diciembre de 2020

Comisionada Alterna PNP

Comisionado Alterno PPD

Comisionada Alterna PIP

Comisionada Alterna MVC

Comisionado Alterno PD

Nota: Los cuadrantes en negro representan colegios no existentes en dicha unidad.

VER ANEJOS

Escaneado con CamScanner

Anejo 2

Anejo 3



COMISIÓN ESTATAL DE ELECCIONES DE PUERTO RICO

## CERTIFICACIÓN

La Comisión Estatal de Elecciones, luego de finalizado el Escrutinio General de las Elecciones Generales celebradas el 3 de noviembre de 2020, adjudicados y contabilizados el 100% de los votos, certifica el siguiente resultado para nominación directa:

**Edgardo Cruz Vélez**      NOMINACIÓN DIRECTA      2,411 votos
"Write In"

Esta certificación no conlleva una certificación formal o informal de ningún candidato, más bien informar el resultado. Se hace en cumplimiento con lo establecido en la Sentencia del Tribunal Supremo de Puerto Rico, el Recurso CT-2021-001 Consolidado con CT-2021-002, respecto al Precinto 048 de Guánica.

Se emite esta Certificación para los efectos legales pertinentes según autoriza el artículo 3.12 (7) del Código Electoral de Puerto Rico 2020.

De conformidad con el Código Electoral de Puerto Rico, Ley 58-2020 todo candidato a alcalde que resultare electo en la elección general deberá acreditar que ha tomado el Curso sobre Uso de Fondos y Propiedad Pública y todos aquellos requisitos dispuestos en Ley, previo a su certificación como candidato electo.

Para que así conste, firmo y sello la presente a petición del Presidente de la Comisión Estatal de Elecciones de Puerto Rico.

**CERTIFICO:**      Que en esta misma fecha he notificado con copia de esta Certificación a los Comisionados Electorales de todos los partidos.

En San Juan, Puerto Rico a 15 de enero de 2021.

FELIPE VELÁZQUEZ-RAMÍREZ
SECRETARIO SUSTITUTO

# Anejo 3



COMISIÓN ESTATAL DE ELECCIONES

**CEE-AC-21-011**

21 de enero de 2021

MIEMBROS DE LA COMISIÓN

## CERTIFICACIÓN DE DESACUERDO-RESOLUCIÓN

Se transcribe el Desacuerdo-Resolución de la Reunión de Comisión celebrada el jueves, 14 de enero de 2021, concluidos los trabajos el 15 de enero de 2021 a las 3:49 a.m. para su conocimiento y acción que corresponda.

**ACTAS DE LA UNIDAD 75 DEL PRECINTO DE GUÁNICA 048 IDENTIFICADAS POR EL REPRESENTANTE DEL SEÑOR EDGARDO CRUZ VÉLEZ, CUYOS VOTOS NO LES FUERON ADJUDICADOS EN EL INFORME PRELIMINAR DE CONSOLIDACIÓN DE NOMINACIÓN DIRECTA DE ALCALDE DE GUÁNICA PREPARADO POR LOS COMISIONADOS ELECTORALES ALTERNO EL LUNES, 21 DE DICIEMBRE DE 2020 Y LA CANTIDAD VOTOS POR NOMINACIÓN DIRECTA "WRITE IN" RECIBIDA PARA EL SEÑOR EDGARDO CRUZ VÉLEZ**

Discutido el asunto por los Comisionados, en Desacuerdo adjudicar los votos de las Actas de la Unidad 75 del Precinto de Guánica 048 identificadas por el representante del señor Edgardo Cruz Vélez, cuyos votos no les fueron adjudicados en el informe preliminar de consolidación de nominación directa de alcalde de Guánica preparado por los Comisionados Electorales Alternos el lunes, 21 de diciembre de 2020; los Señores Comisionados se expresaron de la siguiente forma:

**PRIMER PARTIDO**: Que se adjudiquen los votos [y] que se incluya[n] en el Informe Preliminar de Consolidación Denominación Directo de Alcalde de Guánica los votos adjudicados el 18 de diciembre, específicamente para la Unidad 7 Colegio 1, Unidad 9 Colegio 1, Unidad 9 Colegio 3, Unidad 10 Colegio 1 y Colegio 2, Unidad 13 Colegio 1 y Colegio 2 para un total de 30 votos que fueron ya adjudicados a favor de Edgardo Cruz desde el 18 de diciembre [de 2020].

**SEGUNDO PARTIDO**: EN CONTRA. Si nosotros planteamos aquí, en el día de ayer, en la tarde y la noche de ayer. ¿Cuál es la orden del tribunal? Yo sé que el Presidente hizo un resumen sobre eso, pero en efecto, se acaba de completar un escrutinio de actas, y, nosotros no estábamos autorizados para eso, pero peor aún en la misma discusión que acaba de ocurrir hace unos minutos atrás siempre va asistir a la confusión, si eso se pudo haber adjudicado en algún

20210121 DESACUERDO -RESOLUCIÓN
CEE-AC-21-011
PÁGINA 2

momento. No hay ninguna certeza, y, entonces en ese sentido por eso es que es importante y el presidente lo había manifestado anteriormente ayer eso de no adherir, no caer en esto de abrir un proceso de escrutinio en este momento, yo, hubiese preferido el camino que se l[e] aconsejó [e]l compañero, que se había copia de todo y quisiéramos, recordemos, que tuviera que hacer, pero no con este nivel de incertidumbre, o sea, aquí nadie tiene la certeza si se adjudicó o no la misma discusión que ocurrió hace unos minutos atrás lo demuestra, y, entonces ahora vamos a caer en la de adjudicar sin saber si no está en cualquier otro, en otro lugar.

**TERCER PARTIDO:** Bueno, secundo la moción del primer partido, porque me parece que lo correcto es lo que hay que hacer, porque a mi entender no están en este [Informe] preliminar, así que por lo tanto yo mi deber es secundarla.

**CUARTO PARTIDO:** Nuestros votos a favor, ya que la extensa discusión que hemos tenido al respecto y el hecho de que habían las copias de esa acta que no estaban en la sumatoria original, pues no podría y aunque entiendo el punto de que la instrucción del tribunal era para una cosa, pero [no] sería bueno defraudar el proceso teniendo esto frente a nosotros y la orden del tribunal era para honrarla. La intención del elector estamos viendo ahí con votos que no ha sido adjudicado[s] o que fuera[s] adjudicado[s] pero no fueron contados, pues lo correcto es que se cuenten.

**QUINTO PARTIDO:** Sí, nosotros estamos a favor de que se adjudiquen, y, en adición, la base de este informe preliminar de consolidación de nominación directa del alcalde de Guánica, pues no solamente se limita al acta "print out", sino que tiene unos anejos que lo sustentan; no sea que el mismo se sea válido se valide por los propios anejos que contiene, que es que es la evidencia de donde salen estos números con lo que le pusimos como anejo.

**PRESIDENTE:** Estando en desacuerdo los Comisionados y conforme al Inciso (2) del Artículo 3.4 del Código Electoral de Puerto Rico 2020,corresponde al Presidente resolver: Haciéndome eco de mi introducción, yo tengo que expresar además, que en este asunto particular, más allá de que podemos observar las actas donde se tabularon y adjudicaron los votos de forma manual, estas no se encontraban en el maletín que produjo el informe preliminar, que, como bien dice el quinto partido, fue la base para preparar todos los sobres [que] aparecieron en el maletín de donde emanan o se producen las actas que finalmente se colocaron en el maletín de apoyo del informe. Si nos crea gran suspicacia que todos sean del mismo día, todos son del 18 de diciembre del 2021. No he recibido ni se me ha presentado una razón, causa o justificación para que esto haya ocurrido, que me permita concluir que estos, estas papeletas se adjudicaron en otra unidad. Yo hubiese entendido que una estuviera fuera de lugar, a lo sumo dos (2) pero aquí tenemos casi diez (10) y eso si me crea suspicacias. No sé qué fue lo que ocurrió, no sé si fue un error humano, pero estando dentro del maletín, las papeletas no hay una explicación para que las actas no estén dentro del maletín correspondiente a las actas que producirían el resumen que se llama informe.

Así las cosas, se instruye a que le sean añadidos al informe preliminar aquellos votos de:
Unidad 7 Colegio 1, se le adjudican dos (2) votos a Edgardo Cruz Vélez.
Unidad 9 Colegió 1 se le adjudican cinco (5) votos a favor de Edgardo Cruz Vélez.
Unidad 9 Colegio 2 se le adjudican nueve (9) votos a favor de Edgardo Cruz Vélez.

20210121 DESACUERDO -RESOLUCIÓN
CEE-AC-21-011
PÁGINA 3

Unidad 9 Colegió 3 se le adjudican cinco (5) votos a favor de Edgardo Cruz Vélez.
Unidad 10 Colegio1 se le adjudiquen dos (2) votos a favor de Edgardo Cruz Vélez.
Unidad 10 Colegio 2 se le adjudique un (1) voto a favor de Edgardo Cruz Vélez.
Unidad 13 Colegio 1 se le adjudique un (1) voto a favor de Edgardo Cruz Vélez.
Unidad 13 Colegio 2 se le adjudique trece (13) votos a favor de Edgardo Cruz Vélez.

Luego de haberse contabilizado el 100 % de los votos en el Escrutinio General del 2020 y cumpliendo con la Sentencia del Tribunal Supremo de Puerto Rico, se le adjudican al Sr. Edgardo Cruz Vélez la cantidad de 2411 votos. Los votos se desglosan de la siguiente manera:

| PROCEDENCIA DE LOS VOTOS DE NOMINACIÓN DIRECTA DE EDGARDO CRUZ VÉLEZ | CANTIDAD DE VOTOS |
|---|---|
| Informe Preliminar de Consolidación de Nominación Directa de Alcalde de Guánica preparado por los Comisionados Electorales Alternos el 21 de diciembre de 2020 | 2335 |
| Unidad 07 | 1 |
| Votos adjudicados siguiendo la Orden del Tribunal | 23 |
| Unidad 79 Posterior al 21 de diciembre de 2020 | 14 |
| Unidad 75 que fueron previamente desglosadas el 18 de diciembre de 2020 y añadidas al Informe Preliminar de Consolidación de Nominación Directa de Alcalde de Guánica preparado por los Comisionados Electorales Alternos el 21 de diciembre de 2020 | 38 |
| TOTAL | 2411 |

Presentado el desglose y la cantidad de votos a los Señores Comisionados, su posición es la siguiente:

PRIMER PARTIDO: **A FAVOR.**
SEGUNDO PARTIDO: **EN CONTRA** de que se adjudiquen las 38 papeletas por las razones que ha explicado, con las demás no hay objeción.
TERCER PARTIDO: **A FAVOR**
CUARTO PARTIDO: **A FAVOR**
QUINTO PARTIDO: **A FAVOR**

Planteado el desacuerdo, el Presidente resuelve la controversia conforme al Inciso (2) del Art. 3.4 de la Ley. Núm. 58-2020, mejor conocida como` Código Electoral de Puerto Rico de 2020 y determina: Instruye al señor Secretario Sustituto a certificar como los votos contabilizados y adjudicado al señor Edgardo Cruz Vélez resultante Del Escrutinio General del 2020 y el cumplimiento con la sentencia del Tribunal Supremo relacionado a la votación de Guánica la cantidad de 2,411 voto. Se instruye para que se realice de forma manual, de forma tal que se pueda conocer la totalización de los números para que el señor Secretario Sustituto pueda preparar la certificación de hoy.

SJ2021CV00287 01/02/2021 06:58:30 pm Entrada Núm. 27 Página 4 de 101

20210121 DESACUERDO -RESOLUCIÓN
CEE-AC-21-011
PÁGINA 4

Conforme al Artículo 13.2 de la Ley Núm. 58-2020, mejor conocida como "Código Electoral de Puerto Rico 2020" dispone que cualquier Comisionado Electoral o parte adversamente afectada por una decisión, resolución, determinación u orden de la Comisión o la Comisión Local podrá, dentro de los diez (10) días siguientes a la notificación de esta, recurrir al Tribunal de Primera Instancia con la presentación de un recurso legal de revisión.

Así se acuerda.

Felipe Velázquez Ramírez
Secretario Sustituto

Anejo 4



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Edgardo Cruz Vélez, como aspirante a la Alcaldía del Municipio de Guánica bajo la modalidad de nominación directa

Peticionario

v.

Comisión Estatal de Elecciones, representada por su Presidente, Francisco Rosado Colomer

Peticionaria

Roberto Iván Aponte Berríos, como Comisionado Electoral del Partido Independentista Puertorriqueño y Otros

Recurridos

Ismael "Titi" Rodríguez Ramos, como aspirante a la Alcaldía de Guánica por el Partido Popular Democrático

Recurrido

v.

Comisión Estatal de Elecciones, representada por su Presidente, Francisco Rosado Colomer y Edgardo Cruz Vélez, como aspirante a la Alcaldía del Municipio de Guánica bajo la modalidad de nominación directa

Peticionarios

CC-2021-0169 cons. con CC-2021-0171

Roberto Iván Aponte Berríos,
como Comisionado Electoral
del Partido Independentista
Puertorriqueño y Otros

Recurridos

Opinión disidente emitida por el Juez Asociado SEÑOR ESTRELLA MARTINEZ a la cual se unen la Jueza Asociada SEÑORA PABÓN CHARNECO y el Juez Asociado SEÑOR KOLTHOFF CARABALLO

En San Juan, Puerto Rico, a 16 de marzo de 2021.

Durante los pasados años, Guánica ha enfrentado un estado de emergencia en múltiples dimensiones de su diario vivir. Al día de hoy, muchas de las interrogantes de los guaniqueños y las guaniqueñas siguen sin contestarse. Con ello en mente, hace más de dos (2) meses, advertí en mi expresión particular del caso Edgardo Cruz Vélez v. Comisión Estatal de Elecciones y otros, CT-2021-0005, que la situación electoral del Municipio de Guánica constituía una emergencia democrática. Hoy, tristemente, ese cuadro de emergencia se perpetúa sin que alguno de los foros judiciales hubiera auditado y escudriñado eficientemente el material electoral en controversia para constatar la voluntad del electorado de Guánica. Peor aún, hoy se suma en la historia de Guánica otra gran interrogante que nunca se contestará con certeza matemática y democrática: **¿Quién realmente ganó la Alcaldía de Guánica?**

Como últimos garantes de la confianza de la ciudadanía en la democracia, este Tribunal tenía el deber

de promover la contestación categórica a esa interrogante, lo cual sólo se podía lograr si revocábamos el dictamen del Tribunal de Primera Instancia por disponer **livianamente** de esta controversia mediante sentencia sumaria. No obstante, al estar igualmente dividido este Tribunal, eso no se pudo alcanzar. Ello, a pesar de la complejidad de la prueba y de las controversias de hechos esenciales que plantearon la Comisión Estatal de Elecciones (CEE) y el Sr. Edgardo Cruz Vélez (señor Cruz Vélez) al oponerse a la solicitud de sentencia sumaria del Sr. Ismael Rodríguez Ramos (señor Rodríguez Ramos).

En este caso, era imprescindible que ordenáramos al foro primario que evaluara con rigurosidad la totalidad del material electoral vivo en pugna para que así pudiera constatar, inequívocamente, la alegada duplicidad de votos propuesta por el señor Rodríguez Ramos. Al así no hacerlo, los foros recurridos, arbitrariamente, brindaron primacía a una serie de tablas y actas incompletas por sobre la voluntad del electorado, lo cual redunda, de facto, en la potencial invalidación del derecho al sufragio a 38 electores o electoras del Municipio de Guánica.

El efecto ineludible de haberse acogido de plano tal teoría y determinarse que era innecesario el trámite ordinario de una vista evidenciaria, más allá de ser incorrecto como cuestión de derecho, es que regirá la incertidumbre por los próximos cuatro (4) años sobre

quién, en realidad, obtuvo una mayoría de los votos y ganó la contienda electoral por la alcaldía de Guánica.

Expuesta la controversia, veamos los antecedentes fácticos y procesales que la suscitaron.

**I**

La controversia de autos inició con la presentación de una impugnación de elección por parte del señor Cruz Vélez, aspirante a la Alcaldía de Guánica por nominación directa, en contra del señor Rodríguez Ramos, alcalde impugnado. En síntesis, el señor Cruz Vélez cuestionó la Certificación de Elección que declaró al señor Rodríguez Ramos como alcalde electo, toda vez que, tras el recuento ordenado por este Tribunal en Rodríguez Ramos v. Comisión Estatal de Elecciones, 2021 TSPR 03, la CEE, el 15 de enero de 2021, certificó que éste obtuvo un total de 2,411 votos, cantidad mayor a los obtenidos por el señor Rodríguez Ramos. En consecuencia, solicitó que se ordenara a la CEE a dejar sin vigencia la Certificación de Elección y a certificarle como el alcalde electo del Municipio de Guánica.

Por su parte, el señor Rodríguez Ramos presentó un recurso de revisión judicial, el cual fue consolidado eventualmente con el caso del señor Cruz Vélez. En esencia, el señor Rodríguez Ramos cuestionó la certificación emitida por la CEE el 15 de enero de 2021, la cual acreditó el nuevo total de votos para el señor Cruz Vélez, y la Certificación de Desacuerdo, Resolución

CEE-AC-2021-011 (Certificación de Desacuerdo), también emitida por la CEE el 21 de enero de 2021.

Una vez consolidados ambos recursos, el señor Rodríguez Ramos presentó una solicitud de sentencia sumaria. En lo pertinente, manifestó que el recurso de impugnación incoado debía ser desestimado debido a que las certificaciones de la CEE contenían un número de votantes incorrecto. Particularmente, objetó la identificación de ocho (8) actas con un total de 38 votos provenientes de la Unidad 75 que alegadamente no se habían contabilizado. Éste protestó que, luego de que los comisionados electorales no llegaran a un acuerdo sobre el curso de acción a seguir con dichas papeletas, el Presidente de la CEE optara por contabilizarlas y añadirlas al total de votos que obtuvo el señor Cruz Vélez.

En apoyo a su contención, el señor Rodríguez Ramos adujo que dichos votos habían sido adjudicados dentro de la Unidad 79 y sumados en el Informe Preliminar de Consolidación de Nominación Directa de Alcalde de Guánica (Informe Preliminar) de 21 de diciembre de 2020. Ello, puesto que las papeletas o votos provenientes de la Unidad 75 eran referidas a la Unidad 79 para su correspondiente evaluación y adjudicación por parte de los Comisionados Alternos.[19] Así, mediante un cálculo

---

[19]Los votos de nominación directa no pudieron ser leídos por la máquina de escrutinio electrónico. Por consiguiente, las papeletas por nominación directa que eran protestadas o impugnadas en las mesas de escrutinio eran referidas a la Mesa de Conteo Manual, conocida como la Unidad 75. De ser protestadas nuevamente,

matemático y un análisis comparativo entre las alegadas actas que fueron referidas de la Unidad 75 a la Unidad 79, el señor Rodríguez Ramos pretendió demostrar que los 38 votos identificados habían sido previamente sumados al Informe Preliminar.[20] Esto, a pesar de que es un hecho incontrovertido que las ocho (8) actas con los 38 votos aquí en controversia no se encontraron dentro del maletín de la Unidad 79.

Oportunamente, tanto el señor Cruz Vélez como la CEE presentaron sus oposiciones a que se dictara sentencia sumaria y rechazaron que estos 38 votos hubieran sido duplicados. A pesar de que reconocieron que los votos impugnados habían sido previamente **escrutados**, negaron que se duplicara su contabilización, pues, entre otras razones, dichas ocho (8) actas no se encontraron dentro

---

éstas se referían a una Mesa Especial conocida como la Unidad 79, la cual estaba compuesta por los distintos Comisionados Alternos. Véase, Comisión Estatal de Elecciones, Manual de procedimientos para el escrutinio general y recuento 2020, págs. 36-37 (https://ww2.ceepur.org/sites/ComisionEE/es-pr/Secretaria/Manuales/Manual%20de%20procedimientos%20para%20el%20Escrutinio%20General%20y%20Recuento%202020.pdf) (última visita 16 de marzo de 2021).

[20]Además, éste fundamentó su contención en que, según se desprende de una hoja de trámite, la Unidad 79 tuvo ante su consideración un total de 14 actas, de las cuales ocho (8) correspondían a los 38 votos que, alegadamente, no habían sido contabilizados. Así, planteó que la sumatoria de estas ocho (8) actas con 38 votos y las otras seis (6) actas equivalentes a 18 votos que surgen de los documentos de la Unidad 79, totalizan 56 votos. Por ello, alegó que, teniendo en consideración que los Comisionados Alternos decidieron no adjudicar uno (1) de los 56 votos referidos a la Unidad 79, finalmente, la cantidad de votos escrutada y adjudicada a favor del señor Cruz Vélez, a saber, 55 votos, coincide con el total de votos que le fueron sumados a éste en el Informe Preliminar. Véase, Apéndice de certiorari presentado por el señor Cruz Vélez, Moción de sentencia sumaria, págs. 305-306; Íd., Hoja de trámite (Anejo 6), pág. 403.

del maletín que contenía las actas en las que se fundamentó la preparación del Informe Preliminar que reflejó la suma de los votos allí contenidos.

En particular, el señor Cruz Vélez destacó que el proceso de escrutinio general y recuento comenzó el 11 de diciembre de 2020 y que no fue hasta el 21 de diciembre de 2020 que, a través del Informe Preliminar, se consolidaron todas las actas adjudicadas previamente y **se totalizó la suma de todos los votos a su favor**. Con respecto a la alegada duplicidad de votos, el señor Cruz Vélez señaló que el señor Rodríguez Ramos no presentó la totalidad de la prueba y, en vez, prefirió no "presentar otras actas, hojas de trámites y/o documentación crucial que contradice[n]" el hecho de que estos votos habían sido previamente adjudicados y **sumados** al Informe Preliminar.[21] Asimismo, argumentó que el señor Rodríguez Ramos omitió indicar que, el 17 de diciembre de 2020, se refirieron a la Unidad 79 **"61 papeletas compuestas de doce (12) sobres con actas"**,[22] esto, además del total de nueve (9) actas con 47 papeletas referidas luego el 18 de diciembre de 2020.[23] Por lo cual, sostuvo que la exclusión de las hojas de trámite que así lo acreditan y demuestran que la Unidad 79 tuvo ante su consideración

---

[21]Íd., Oposición a moción de sentencia sumaria, pág. 750.

[22]Íd., págs. 751-752. Véase, además, Hoja de trámite (Anejo 10(a)), pág. 794 y Hoja de trámite de escrutinio (Anejo 10(b)), pág. 795.

[23]Íd., Hoja de trámite de escrutinio (Anejo 11), pág. 796.

dos (2) grupos de actas de distintos colegios y unidades que totalizaban 108 papeletas fue intencionada.

En ese sentido, arguyó que el señor Rodríguez Ramos optó por obviar que, según se desprende de la correspondiente acta de incidencia, del total de 61 papeletas referidas el 17 de diciembre, "fueron adjudicadas 50 a favor" del señor Cruz Vélez.[24] A su vez, sostuvo que "el total de votos adjudicados para la fecha del 18 de diciembre de 2020 por la Mesa Especial de Comisionados Alternos, Unidad 79 fue de 43 votos".[25] En atención a ello, concluyó que "de las 108 papeletas referidas [a la Unidad 79] entre el 17 y 18 de diciembre de 2020, fueron adjudicadas a favor del Sr. Edgardo Cruz Vélez para esas fechas un total de 93 papeletas".[26] No obstante, adujo que por error humano, en el Informe Preliminar se tabularon únicamente 55 de los 93 votos confirmados, pues sólo se utilizó el Acta del 17 de diciembre de 2020 con un total de 50 votos y, exclusivamente, 5 votos de la Unidad 13, Colegio 02, correspondiente a una (1) de las nueve (9) actas referidas a la Unidad 79 el 18 de diciembre de 2020.[27] Es decir, adujo que, al sumársele tan sólo esa acta con 5 votos, se excluyó del conteo las otro ocho (8) actas referidas el 18 de diciembre, las cuales representan,

---

[24]Íd., _Oposición a moción de sentencia sumaria_, págs. 752-753.

[25]Íd., _Moción suplementaria a oposición a moción de sentencia sumaria_, pág. 1067.

[26]Íd.

[27]Íd., pág. 1068

precisamente, aquellas ocho (8) actas con 38 votos identificadas como sin contabilizar.[28]

Por tanto, concluyó que, toda vez que la Unidad 79 le adjudicó 93 votos a su persona y que del Informe Preliminar se desprende que sólo se le sumaron un total de 55 votos, fue correcta la inclusión de los 38 votos en controversia. Entiéndase, la suma de estos 38 votos con los 55 contenidos en el Informe Preliminar alcanza los 93 votos que éste alega que obtuvo a su favor en la Unidad 79.

Por su parte, la CEE confirmó que estos 38 votos no habían sido sumados y recogidos en el Informe Preliminar, ya que las ocho (8) actas de las cuales éstos surgieron **no estaban dentro del maletín que contenía la totalidad de las actas que fueron utilizadas para la preparación de dicho Informe Preliminar**. Dicho de otro modo, la propia CEE reconoció que los 38 votos alegadamente duplicados fueron escrutados el 18 de diciembre de 2020, pero que, por error u omisión, no se incluyeron en la suma total del Informe Preliminar. Por consiguiente, la CEE insistió en que los votos adjudicados al señor Cruz Vélez mediante la Certificación de Desacuerdo se trató de una "rectificación de los resultados en base a votos previamente adjudicados y que no se habían sumado. No es una duplicidad de votos. . .".[29] Siendo ello así,

_____

[28]Íd., págs. 1068-1069.

[29]Íd., Moción en oposición a sentencia sumaria y solicitud de desestimación parcial, pág. 842. Con respecto a este particular, se

especificó que "[u]na vez traíd[a] dicha falta de inclusión de esos votos, contenidos en las actas en posesión de los comisionados; en cumplimiento del deber de que los procesos electorales se realicen con pureza, transparencia y libre de fraude", el Presidente de la CEE tomó la determinación de sumarlos al Informe Preliminar.[30]

---

incluye el texto íntegro correspondiente de la Certificación de Desacuerdo:

> Haciéndome eco de mi introducción, yo tengo que expresar además, que en este asunto particular, **más allá de que podemos observar las actas donde se tabularon y adjudicaron los votos de forma manual, estas no se encontraban en el maletín que produjo el informe preliminar, que, como bien dice el quinto partido, fue la base para preparar todos los sobres [que] aparecieron en el maletín de donde emanan o se producen las actas que finalmente se colocaron en el maletín de apoyo del informe.** S[í] nos crea gran suspicacia que todos sean del mismo día, todos son del 18 de diciembre de 202[0]. No he recibido ni se me ha presentado una razón, causa o justificación para que esto haya ocurrido, que me permita concluir que estos, estas papeletas se adjudicaron en otra unidad. Yo hubiese entendido que una estuviera fuera de lugar, a lo sumo dos (2) pero aquí tenemos casi diez (10) y eso s[í] me crea suspicacias. No sé qué fue lo que ocurrió, no sé si fue un error humano pero estando dentro del maletín, las papeletas **no hay una explicación para que las actas no estén dentro del maletín correspondiente a las actas que producirían el resumen que se llama informe.** (Énfasis suplido). Íd., Certificación de Desacuerdo, pág. 107.

Así las cosas, el Presidente instruyó a que le fuesen añadidos al Informe Preliminar 38 votos a favor del señor Cruz Vélez, provenientes originalmente de la Unidad 75 y los cuales fueron remitidos a la Unidad 79 el 18 de diciembre de 2020. Íd., págs. 107-108.

[30] Íd., Moción en oposición a sentencia sumaria y solicitud de desestimación parcial, pág. 843.

En ese sentido, ante la solicitud del señor Rodríguez Ramos de invalidar tales 38 votos por alegadamente estar duplicados, la CEE destacó que:

> **De la prueba o documentación presentada por Rodríguez Ramos en su solicitud de sentencia sumaria, solamente presenta actas correspondientes a 38 votos, no [hay] un desglose detallado por Unidad y Colegio que lleve a concluir que los votos fueron, efectivamente, duplicados como este alega, ni una comparativa de las actas contenidas en el Informe Preliminar y las contenidas en la Resolución del Presidente CEE-AC-21-011, que demuestren la duplicidad de las mismas.**[31] (Énfasis suplido). Íd., pág. 830.

Por ese motivo, objetó la contención del señor Rodríguez Ramos y enfatizó que lo solicitado por éste "es que, de facto, se anulen los votos válidamente adjudicados; por un error administrativo de los funcionarios de mesa **no** se proveyeron ciertas actas para ser sumadas en un resumen preparado manualmente. . .".[32]

En fin, concluyó que el foro de primera instancia no debía validar la teoría legal presentada por el alcalde impugnado, pues ésta se ampara en una **"interpretación acomodaticia, irrazonable y fragmentada**

---

[31]Además, el Presidente de la CEE objetó determinadas actas atinentes a la controversia, puesto que éstas "muestr[a]n tachaduras, alteraciones o marcas adicionales a las que están contenidas en la Resolución del Presidente, son actas que pueden ser producto del trabajo de los representantes de los partidos políticos, toda vez que las oficiales de la CEE contenidas en la Resolución CEE-AC-21-011 no tienen esas marcas". Íd., Moción supletoria y aclaratoria de oposición a sentencia sumaria y solicitud de desestimación parcial, pág. 1215.

[32]Íd., Moción en oposición a sentencia sumaria y solicitud de desestimación parcial, pág. 846.

**de lo realmente sucedido durante el proceso de escrutinio general**" pretendiendo así que el "foro primario se extralimite de su función de revisión judicial, para extender su brazo revisor, tanto [a] las interioridades del proceso de escrutinio general [como] al proceso administrativo de adjudicación, escrutinio de papeleta y votos emitidos. . .". (Énfasis suplido).[33]

Con estos planteamientos ante su consideración, el Tribunal de Primera Instancia declaró con lugar la solicitud de sentencia sumaria presentada por el señor Rodríguez Ramos y, consecuentemente, desestimó la impugnación de elección instada por el señor Cruz Vélez. En iguales términos resolvió el foro apelativo intermedio. Por consiguiente, ambos foros acogieron en su totalidad la teoría matemática y el análisis comparativo de actas de la Unidad 75 y la Unidad 79, así propuesto por el alcalde impugnado, y determinaron que no existían controversias de hechos materiales que impidieran disponer del presente caso sumariamente.

Inconformes con tal determinación, el señor Cruz Vélez y la CEE comparecen ante este Tribunal mediante sus respectivos recursos de _certiorari_ en los cuales, en esencia, reiteran los argumentos antes expuestos. Ante esto, una Mayoría de este Tribunal no avaló expedir para revocar y, por estar igualmente dividido el Tribunal, se confirma el dictamen recurrido.

---

[33]Íd., pág. 848.

Por los fundamentos que expondré a continuación, opino que una Mayoría de este Tribunal debió revocar a los foros recurridos. Un análisis detenido y sosegado del tracto procesal y de la documentación provista por las partes, obliga a concluir que los foros recurridos erraron al resolver este caso por la vía sumaria. A mi juicio, **los hechos medulares en controversia en torno a la cuantía correcta de los votos emitidos para esta candidatura**, las controversias levantadas por las partes opositoras y las circunstancias particulares de esta controversia electoral, hacían imprescindible que el foro de primera instancia auditara y escudriñara todo el material electoral vivo en pugna, **de modo que estuviera en posición de determinar con certeza si, en efecto, ocurrió la duplicidad de votos alegada**. Veamos.

## II

Como sabemos, la sentencia sumaria es el mecanismo procesal adecuado para resolver casos en los que, al contar con la evidencia necesaria, no es necesaria la celebración de un juicio por sólo restar aplicar el derecho. 32 LPRA Ap. V., R. 36.3(e); _Lugo Montalvo v. Sol Melía Vacation_, 194 DPR 209, 225 (2015); Córdova Dexter v. Sucn. Ferraiuoli, 182 DPR 541, 555-556 (2011). Para que proceda una solicitud de sentencia sumaria, la parte promovente deberá demostrar "la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. . .". 32 LPRA Ap. V, R. 36.1-36.2. En este contexto, un hecho material esencial y pertinente es

aquel que puede afectar el resultado de la reclamación de conformidad con el derecho sustantivo aplicable. Mejías et al. v. Carrasquillo et al., 185 DPR 288, 300 (2012) (citas omitidas).

No obstante, si bien es cierto que cualquier duda no es suficiente para derrotar una moción de sentencia sumaria, hemos concluido que "[t]oda inferencia que se haga de los hechos incontrovertidos debe hacerse de la manera más favorable a la parte que se opone a esta" tomando en consideración toda la evidencia admisible que así lo demuestre. Íd., pág. 300 (citas omitidas). Así, ante los efectos que tiene su concesión, hemos resuelto que "**en el sano juicio de su discreción, un tribunal no debe resolver sumariamente casos complejos. . .**". (Énfasis suplido). Echandi Otero v. Stewart Title, 174 DPR 355, 369 (2008) (citas omitidas). Ello, pues, **existen controversias que, en vista de su naturaleza y la complejidad que representan, difícilmente un tribunal podría reunir ante sí toda la verdad de los hechos** a través affidavits, deposiciones o declaraciones juradas. Jusino et als. v. Walgreens, 155 DPR 560, 579 (2001)(citas omitidas).

Ahora bien, con anterioridad hemos pautado que el Tribunal de Apelaciones se encuentra en la misma posición que el Tribunal de Primera Instancia al momento de revisar solicitudes de sentencia sumaria. _Meléndez González et al. v. M. Cuebas,_ 193 DPR 100, 118 (2015); _Vera v. Dr. Bravo,_ 161 DPR 308, 334 (2004)).

Entiéndase, le corresponde al foro apelativo en consideración realizar una evaluación de novo, teniendo en consideración que se debe "examinar el expediente de la manera más favorable a favor de la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor". *Meléndez González et al. v. M. Cuebas*, supra, pág. 116 (citas omitidas). Para ello, en particular, **es indispensable "analizar tanto los documentos que acompañan la solicitud como los documentos de la oposición para determinar si existe o no controversia de hechos".** (Énfasis suplido). Rosado Reyes v. Global Healthcare Group, LLC, 2020 TSPR 136.

En vista de lo anterior, un tribunal debe evaluar todos los documentos que obren en el expediente de modo que, previo a determinar la procedencia de una solicitud de sentencia sumaria, realice un "balance adecuado entre el derecho de todo litigante a tener su día en corte y la disposición justa, rápida y económica de los litigios civiles". Rosado Reyes v. Global Healthcare Group, LLC, supra (citas omitidas).

Teniendo en mente el presente marco doctrinal, procedo a exponer las razones de mi disenso.

**III**

Una lectura detenida y sosegada de las oposiciones del señor Cruz Vélez y de la CEE, como también de sus réplicas, dúplicas y la documentación anejada, levanta

interrogantes que, por la naturaleza de la propia moción de sentencia sumaria, debieron ser suficientes para que una Mayoría de este Tribunal ejerciera su prudencia, denegara la utilización de este mecanismo en esta instancia y así revocara los dictámenes aquí recurridos.

Primeramente, ya desde una moción en cumplimiento de orden que precedió la solicitud de sentencia sumaria, la CEE había explicado que, aunque los 38 votos fueron adjudicados el 18 de diciembre de 2020, éstos no se incluyeron en el Informe Preliminar de 21 de diciembre de 2020, por lo que había que sumarlos a su total.[34] Como cuestión de hecho, la prueba documental oficial y las declaraciones juradas que ofreció el señor Rodríguez Ramos para promover la sentencia sumaria, fallan en acreditar que, en efecto, dichos votos fueron **contabilizados en el Informe Preliminar.**[35] Ello, sumado al hecho incontrovertido de que las ocho (8) actas con 38 votos aquí en controversia no se encontraban dentro del maletín utilizado para la preparación de dicho Informe Preliminar, abonan a la aserción de que estos votos fueron adjudicados, mas no sumados a favor del

---

[34]Íd., Oposición a moción de sentencia sumaria, Moción en cumplimiento de orden (Anejo 6), pág. 777-781.

[35]Véase, Declaración jurada del Sr. José Rosario Méndez (Anejo 36), págs. 584-585; Declaración jurada del Sr. Julio Méndez González (Anejo 37), págs. 647-648; Declaración jurada del Sr. Joel Rodríguez Almodóvar (Anejo 38), págs. 657-658, los tres (3), representantes del PPD en la Unidad 79. Refiérase, también, Declaración jurada del Lcdo. Nelson Javier Rodríguez Vargas, Comisionado Alterno del PPD (Anejo 1), quien estuvo presente y participó en la adjudicación de votos bajo la Unidad 79, págs. 691-692; Declaración jurada de la Sra. Enid López Maldonado (Anejo 2), supervisora de Control y Verificación de Actas en representación del PPD, págs. 704-705.

señor Cruz Vélez. **Adviértase que, tal y como expresó el Presidente de la CEE, todas las actas utilizadas como base para la preparación de dicho Informe Preliminar fueron colocadas dentro de un maletín específico en apoyo al mencionado informe.**[36]

Por otro lado, es importante denotar que el señor Rodríguez Ramos fundamentó la alegada duplicidad de las ocho (8) actas con 38 votos en que éstas fueron previamente adjudicadas y sumadas en el Informe Preliminar bajo la Unidad 79. Es decir, adujo que estas ocho (8) actas con 38 votos, en conjunto con otras seis (6) actas con 18 votos, totalizaban las 14 actas y 56 votos que tuvieron ante su consideración los Comisionados Alternos,[37] y los 55 votos que dispone el Informe Preliminar a favor del señor Cruz Vélez en la Unidad 79.[38] No obstante, tales datos están reñidos con la información y la evidencia provista por el señor Cruz Vélez. **Nótese que la cantidad de 21 actas equivalentes a 108 votos que surgen de estas hojas de trámite, las cuales fueron referidas a los Comisionados Alternos** —y,

---

[36]Íd., <u>Certificación de Desacuerdo</u>, pág. 107.

[37]Adviértase que, teniendo en consideración que los Comisionados Alternos decidieron no adjudicar uno (1) de los 56 votos referidos a la Unidad 79, finalmente, la cantidad de votos escrutada y adjudicada a favor del señor Cruz Vélez fue 55 votos. Íd., <u>Moción de sentencia sumaria</u>, págs. 305-306.

[38]Resulta meritorio destacar que, tal y como señaló el Presidente de la CEE, de un análisis de las actas que proveyó el señor Rodríguez Román surgen tachaduras, alteraciones o marcas que no concuerdan con las actas en la Resolución del Presidente, lo que apunta a que tales actas fueron las utilizadas por los representantes de los partidos políticos y no las actas oficiales. Íd., <u>Moción supletoria y aclaratoria de oposición a sentencia sumaria y solicitud de desestimación parcial</u>, págs. 1212-1215 (específicamente incisos 7(c)-(f); 7(h); 7(j); 7(l); 7(n); 7(p); 7(r)-(s), y 7(u).

podemos presumir, fueron adjudicadas en la Unidad 79— **controvierte la documentación provista por el señor Rodríguez Ramos, la cual apunta a que la Unidad 79 sólo tuvo ante su consideración un total de 14 actas equivalentes a 56 votos, de los cuales 55 fueron adjudicados a favor del señor Cruz Vélez.**[39]

Surge con claridad, entonces, que la petición del señor Rodríguez Ramos, a saber, que se dieran por duplicados 38 votos, exigía mucha más ponderación, estudio y prueba que la presentada por éste en conjunto con su presentación gráfica y que los foros recurridos y un sector de este Tribunal transcriben y avalan incorrectamente. **Esto, pues, como puede verse, existían controversias de hechos esenciales ineludibles en cuanto a: (1) la razón por la que las ocho actas no se encontraban en el interior del maletín que se utilizó para preparar el Informe Preliminar; (2) la cantidad verdadera de actas y votos que fueron referidos de la Unidad 75 a la Unidad 79, y (3) el total de votos que fueron adjudicados y contabilizados en la Unidad 79 a favor del señor Cruz Vélez.** Estas controversias se desprenden, no sólo de las explicaciones que provee la CEE, el ente regulador de esta materia, sino también de la propia documentación que se presentó ante los tribunales. Esto, por sí sólo, impedía la resolución de este pleito por la vía sumaria.

---

[39]Íd., Moción de sentencia sumaria, págs. 305-306. Véase, además, Hoja de trámite (Anejo 10(a)), pág. 794; Hoja de trámite de escrutinio (Anejo 10(b)), pág. 795, y Hoja de trámite de escrutinio (Anejo 11), pág. 796.

A mi juicio, un análisis detallado de los documentos del expediente del caso revela con claridad que, como cuestión de derecho, están presentes dos de los fundamentos que con anterioridad hemos identificado como disuasivos para dictar una sentencia sumaria, a saber: (1) que existe una controversia de hechos materiales y esenciales, y (2) que de los propios documentos que acompañaron la moción y las oposiciones a la sentencia sumaria surge una controversia real sobre hechos materiales en controversia. Reyes Sánchez v. Eaton Electrical, 189 DPR 586, 595 (2013); Echandi Otero v. Stewart Title, supra, pág. 369. Por ello, ante la complejidad de la controversia y dada la presencia de tantas incongruencias, contradicciones y dudas, la deliberación judicial más sensata de este Tribunal debió concluir en la revocación de la disposición sumaria del pleito realizada por los foros recurridos.

Toda vez que la controversia central de autos se ciñe a hechos materiales relacionados directamente con material electoral vivo, la resolución correcta de este caso exigía la tramitación de un descubrimiento de prueba riguroso y una auditoría detenida del material en pugna. Sólo de esta manera se podían salvaguardar los intereses y derechos aquí implicados, los cuales, sin duda, son mayores y superiores a los intereses particulares de las partes.

**Recuérdese, este pleito no podía tratarse como una controversia privada típica entre Demandante A y**

**Demandado B, debido a que las consecuencias jurídicas de este caso trascienden al electorado de Guánica, terceras personas cuyo ejercicio del sufragio, según garantizado por nuestra Carta Magna, podría verse potencialmente invalidado <u>de facto</u>**. Véase, Art. II, Sec. 2, Const. PR, LPRA, Tomo 1.

En vista de la naturaleza de las controversias antes esgrimidas, resultaba imprescindible que el foro primario escudriñara y aquilatara el material electoral vivo, de modo que la determinación que finalmente dictara estuviese basada en toda la verdad de los hechos ocurridos. <u>Jusino et als. v. Walgreens</u>, supra, pág. 579 (citas omitidas). Al actuar de forma contraria, o sea, al avalar la resolución de este pleito por la vía sumaria, en lugar de beneficiar, se creó una gran barrera para la parte impugnante. Tal y como he advertido en el pasado:

> Una vez el litigante supera los obstáculos de obtener el dinero para contratar representación legal, pagar los derechos y lograr que le ponchen su demanda en el tribunal, otras barreras económicas persistirán, tales como: los costos relacionados al descubrimiento de prueba, prestaciones de fianza u otra multiplicidad de costos de litigación. **Asimismo, las barreras persisten en otras esferas no económicas, tal cual verjas con puntas filosas en la parte superior, tienen el potencial de ser navajas de doble filo, las cuales positivamente pueden proteger al custodio de un derecho, pero también tienen el potencial negativo de lacerar y no permitir que se cruce al otro lado del remedio.**

> **Si existe una figura que ejemplifica ese potencial de doble filo, es precisamente la sentencia sumaria**. . .. (Énfasis suplido). Luis F. Estrella Martínez, Acceso a la Justicia: Derecho Humano Fundamental, Ediciones SITUM 2017, págs. 137-138 (citas omitidas).

Hoy, el filo rompió a favor del rigorismo y el formalismo e hirió de muerte a la democracia en Guánica. Ello, pues, sin duda alguna, la resolución del caso de autos por la vía sumaria, como cuestión de derecho, no procedía a favor del señor Rodríguez Ramos y no representó un balance adecuado entre la disposición justa de esta controversia y el derecho de la parte impugnante a tener su día en corte. Máxime cuando la disposición sumaria privó a este Tribunal y a los foros recurridos de obtener toda la verdad en esta controversia.

Resulta penoso que el dictamen que hoy este Tribunal confirma por estar igualmente dividido ignore el calvario procesal, tanto judicial como administrativo, aquí implicado y, en cambio, brinde primacía a un rigorismo procesal que sirva de barrera para la búsqueda del verdadero ganador de la candidatura en controversia. Máxime cuando el saldo de este dictamen equivale a que, en la balanza de la justicia electoral y democrática, unas tablas incompletas y actas con tachaduras tengan mayor preeminencia que los miles de votos válidamente emitidos por los guaniqueños y las guaniqueñas.

**IV**

Por todo lo anterior, muestro mi inconformidad a que una Mayoría de este Tribunal no avalara expedir para

revocar el dictamen recurrido, dado que estimo que era imprescindible que el foro primario evaluara con rigurosidad la totalidad del material electoral vivo en pugna para así constatar, inequívocamente, la alegada duplicidad de votos propuesta por el señor Rodríguez Ramos, mediante un descubrimiento de prueba adecuado. Hoy la sentencia sumaria confirmada por este Tribunal emerge como una barrera que jurídicamente ignorará el reclamo de que se conteste con certeza matemática y democrática quién ganó la Alcaldía de Guánica. La Sentencia se ejecutará, pero la incertidumbre perdurará. **DISIENTO.**


                              Luis F. Estrella Martínez

                              Juez Asociado